IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UCB, INC., UCB PHARMA GMBH, and LTS LOHMANN THERAPIE-SYSTEME AG, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 19-474-KAJ **FILED UNDER SEAL** |
| ACTAVIS LABORATORIES UT, INC., | ) ) | |
| Defendant. | | |

## POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    INTRODUCTION

Plaintiffs UCB, Inc., UCB Pharma GMBH, and LTS Lohman Therapie-Systeme

AG (collectively "UCB") own U.S. Patent No. 10,130,589 ("the '589 Patent"), which

claims solid dispersions of certain ratios of amorphous rotigotine free base and

polyvinylpyrrolidone ("PVP") for use in Transdermal Therapeutic Systems ("TTSs"),

i.e., patches that can be applied to a person's skin for delivery of a drug – here, rotigotine.

The '589 Patent claims weight percentage ratios of between 9:4 and 9:6 of rotigotine to

PVP.  Such TTSs are used to treat Parkinson's Disease and Restless Leg Syndrome.

UCB currently markets patches having a 9:4 ratio under the brand name Neupro.  The

FDA approved that TTS in 2012.  UCB had previously marketed an identically branded

patch, between 2007 and 2008.  That earlier patch was the same in every respect except it

contained a weight ratio of 9:2 rotigotine to PVP.  Those earlier patches ("original

Neupro") were recalled in 2008, when the rotigotine in them began to crystallize when

1

the patches were stored at room temperature.  That problem was due to the appearance of

a previously unknown and more stable crystalline form of rotigotine, which came to be

called "Form II" rotigotine.  Both original Neupro (with the 9:2 ratio) and the version

now on the market ("reformulated Neupro") (with the 9:4 ratio) have rotigotine to PVP

ratios within ranges claimed by prior art.  That art includes U.S. Patent No. 6,884,434

("the '434 Patent") and U.S. Patent No. 7,413,747 ("the '747 Patent"), which are also

owned by UCB and are referred to herein as the "Muller Patents."  They are also listed in

the FDA publication "Approved Drug Products with Therapeutic Equivalence

Evaluations" (the "Orange Book") as covering Neupro.

Defendant Actavis Laboratories, Inc. ("Actavis") submitted an Abbreviated New

Drug Application ("ANDA") to the FDA on November 26, 2013, seeking approval to

engage in the commercial manufacture, use, offer for sale, sale, and/or importation of a

generic version of reformulated Neupro.  UCB sued Actavis shortly thereafter, alleging

that Actavis's ANDA infringed the '434 Patent.  *See UCB, Inc. v. Watson Labs., Inc. et.*

*al*, No. 14-cv-1083-SLR (D. Del.) ("*UCB I*").[1]  A bench trial was held in 2017 and UCB

succeeded in obtaining an injunction preventing the FDA from granting final approval of

Actavis's ANDA.  *Id.* (D.I. 270).  The '434 Patent expires at the end of this month, along

with the *UCB I* injunction.  UCB again sued Actavis in March 2019, this time alleging

---

[1] At one point, an entity known as Watson Laboratories, Inc. was the named
defendant on the original suit.  Actavis became the defendant, however, and for ease of
reference, we call the defendant in *UCB I* as well as in this case "Actavis."  *See UCB I*
(D.I. 1) (Complaint), (D.I. 61) (Amended Complaint adding Actavis as co-defendant and
noting that Actavis was formerly known as Watson).

that Actavis's same ANDA infringes its '589 Patent, which does not expire until 2030. Actavis does not dispute that its ANDA infringes the '589 Patent if that patent is valid. Of course, Actavis says it is not. The parties presented their competing evidence and arguments as to the '589 Patent's validity during a three-day bench trial last October.

According to Actavis, the '589 Patent is invalid for anticipation, obviousness, and lack of written description. Actavis contends that the '434 Patent, along with the '747 Patent, describes an identical invention to that of the '589 Patent and claims a range of ratios of rotigotine to PVP (9:1.5 to 9:5) that significantly overlaps with the '589 patent's claimed range (9:4 to 9:6). Actavis also contends that, during the course of treatment with an original Neupro patch, with its 9:2 ratio of rotigotine to PVP ("R:PVP" for short), the ratio of the patch would decrease as rotigotine transferred into the skin, such that, at a certain point during therapy, the patch would embody ratios claimed by the '589 patent. Again according to Actavis, the prior art, including the '434 Patent, various other patents, and the original Neupro patches, taught examples of identical TTSs containing 9:2 and 9:3 weight ratios of rotigotine to PVP. And it says that a person having ordinary skill in the art (a "POSA") would – and UCB, in fact, did – know to slightly increase the amount of PVP in those examples to add stability to the patch, given the well-known stabilizing effect of PVP on amorphous rotigotine, the fact that only small amounts of crystallization were occurring in original Neupro, and the further fact that crystallization was only happening at room temperature and not in cold storage. Actavis also says that others were dissuaded from competing with UCB in the Neupro market by a cohort of blocking

3

patents, negating any potential secondary indicia of non-obviousness. And it argues that an element of the '589 Patent lacks an adequate written description.

UCB responds that a certain prior art reference, United States Serial Number ("USSN") 12/475,390, published as U.S. Patent App. Pub. No. 2009/0299304 and referred to here as the "Tang" reference, is the closest prior art, as the patent examiner found during prosecution. UCB contends that a POSA in 2009 would have understood from Tang that a very significant amount of PVP would be necessary to stabilize the crystallization problem in original Neupro. It argues that, in fact, based on Tang, a POSA would have calculated a 9:18 R:PVP ratio would be needed to solve the Form II crystallization problem, making the actual 9:4 to 9:6 solution claimed in the '589 Patent surprising and inventive over the prior art. UCB also claims that the '589 Patent's written description is sufficient and that secondary considerations favor a conclusion that the '589 Patent is nonobvious.

As explained below, I conclude that the '589 Patent is invalid for anticipation and obviousness, but I also find that Actavis has not shown by clear and convincing evidence that the '589 Patent lacks a sufficient written description.[2]

---

[2] Shortly before trial, Actavis moved for judicial estoppel and has since renewed its motion, arguing that UCB should be estopped from arguing that "their prior art Muller Patents include passages that are not true" or that "any claimed or unclaimed disclosure of the Muller Patents is not enabled." D.I. 121 at 1. Actavis explains that UCB had asserted the Muller Patents in *UCB I*, obtaining an injunction against the approval of Actavis's ANDA based on the '434 Patent. During that infringement suit, UCB's expert opined that the '434 Patent "teaches the use of PVP in ranges 'in a patch that works.'" D.I. 121 at 14. And while enablement was not disputed, Actavis contends that it is inconsistent for UCB to have previously asserted that the '434 Patent taught a working technology but to now argue that a POSA reading the '434 Patent would not envisage a

## II.   FINDINGS OF FACT[3]

### A.   The Parties

1.     Plaintiff UCB, Inc. is a corporation organized and existing under the laws of the State

of Delaware, having a place of business at 1950 Lake Park Drive, Smyrna, Georgia

---

working technology such as would render the '589 Patent obvious or anticipated. Actavis focuses on UCB's current position that the '434 Patent would not teach a POSA that 9:4 to 9:6 weight ratio patches would actually work, even though the '434 Patent is the basis of an existing injunction against the production of 9:4 and 9:5 patches.

UCB responds to Actavis's motion by arguing that it did not and does not offer any enablement argument related to the '434 Patent, because enablement is a legal concept measured as of the patent's priority date, which is 1998 in the case of the Muller Patents. D.I. 131 at 1. UCB also argued that even if enablement had been disputed in *UCB I*, enablement as it relates to prior art anticipation is different than enablement as it relates to patentability, which was the only type of enablement that could have been at issue in *UCB I* for the '434 Patent. Thus, UCB asserts that even an implicit *UCB I* position that the Muller Patents are enabled would not be "irreconcilably inconsistent" with its current argument that the Muller Patents would not have taught a POSA in 2009 that the '589 Patent's claimed range works. D.I. 131 at 13-15 (citing *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001)).

I denied Actavis's estoppel motion without prejudice at the pre-trial conference, D.I. 178 at 62-63, and Actavis renewed their motion in post-trial briefing. D.I. 161 at 4 n.2. It argues persuasively that there is a head-snapping inconsistency with UCB asserting a patent and obtaining an injunction against a particular technology – an injunction still in force – but now arguing that a POSA, viewing that patent, would not believe that the enjoined technology would work. Without deciding the matter, I suspect that UCB's sharply contradictory positions in *UCB I* and here are irreconcilably inconsistent or, at the very least, worthy of a chutzpah award. Nevertheless, because I conclude that the '589 Patent is invalid for anticipation and obviousness, I need not reach Actavis's estoppel motion and will deny it as moot.

[3] Throughout these Findings of Fact and Conclusions of Law, I may have adopted without attribution language suggested by one side or the other in this dispute. In all such instances, the finding or conclusion in question has become my own, based upon my review of the evidence and the law. To the extent that any of my findings of fact may be considered conclusions of law, or vice versa, they should be considered as such.

5

30080.  SUF ¶ 1.[4]  Plaintiff UCB Pharma GmbH ("UCB Pharma") is an entity organized and existing under the laws of the Federal Republic of Germany, having a place of business at Alfred-Nobel-Strasse 10, Monheim, Germany.  SUF ¶ 2.

2.    Plaintiff LTS Lohmann Therapie-Systeme AG ("LTS") is a corporation organized and existing under the laws of the Federal Republic of Germany, having an office and place of business at Lohmannstrasse 2, 56626 Andernach, Germany.  SUF ¶ 3.

3.    Defendant Actavis Laboratories UT, Inc. ("Actavis") is a corporation organized and existing under the laws of the State of Delaware, having places of business at 575, 577, and 579 Chipeta Way, Salt Lake City, Utah.  SUF ¶ 4.

### B.    The Experts

4.    Various experts testified on behalf of both parties at trial, and are noted below in the order they appeared at trial:

    a.    Dr. Robin Rogers, expert for Actavis, was submitted as an expert in solid state and medicinal chemistry, polymorphism, and their application to transdermal pharmaceutical products.  Tr. 83:20-23 (Rogers).

    b.    Dr. Mark Prausnitz, expert for Actavis, was submitted as an expert in the areas of chemical engineering, transdermal formulations, and transdermal drug delivery devices.  Tr. 330:2-5 (Prausnitz)

    c.    Dr. Allan Myerson, expert for UCB, was submitted as an expert in the field of crystallization, nucleation, polymorphism, stabilization of amorphous

---

[4] "SUF" refers to the parties previously filed Statement of Uncontested Facts, D.I. 132, Ex. 1.

forms, amorphous solid dispersions, and their use in pharmaceuticals. Tr. 464:16-20 (Myerson).

d.   Dr. Richard Guy, expert for UCB, was submitted as an expert in the field of pharmaceutical formulation, including transdermal drug delivery. Tr. 716:16-19 (Guy).

e.   Dr. Rahul Guha, expert for UCB, was submitted as an expert economist specializing in the pharmaceutical and healthcare markets. Tr. 785:7-10 (Guha).

C.   **Neupro**

5.   UCB holds approved New Drug Application No. 021829 ("UCB's NDA") for a Rotigotine Transdermal System (delivered in doses of 1 mg/24 hours, 2 mg/24 hours, 3 mg/24 hours, 4 mg/24 hours, 6 mg/24 hours, and 8 mg/24 hours), which UCB sells under the registered trademark "Neupro." SUF ¶ 5.

6.   Neupro is FDA-approved for the treatment of idiopathic Parkinson's Disease, and for the treatment of moderate-to severe Restless Leg Syndrome. SUF ¶ 6.

7.   The FDA first approved Neupro in May 2007 for the treatment of idiopathic Parkinson's Disease. But original Neupro had a problem. UCB had to recall it from the U.S. market in 2008 because crystalline structures of rotigotine appeared in some patches. Those structures were later explained as resulting from the existence of the previously unknown Form II polymorph of rotigotine, a more stable crystalline structure. SUF ¶ 7.

8.    Following the recall, UCB investigated Form II, and, on December 22, 2009, it filed

an application that eventually resulted in the issuance of the '589 Patent, which

addresses the Form II crystallization problem.  Tr. 639:11-15 (Hakes).  Based on that

development, the FDA approved reformulated Neupro in April 2012 for the treatment

of idiopathic Parkinson's Disease, and for the treatment of moderate-to-severe

Restless Leg Syndrome.  PTX-482.  Pursuant to 21 U.S.C. § 355(b)(1), and attendant

FDA regulations, the '589 Patent is listed in the Orange Book with respect to

reformulated Neupro.  SUF ¶ 10; DTX-78.

9.    As of 2014, the following patents were also listed by UCB in the Orange Book

covering Neupro:

- U.S. Patent No. 6,699,498

- U.S. Patent No. 6,884,434 ("the '434 Patent" or "Muller '434")

- U.S. Patent No. 7,413,747 ("the '747 Patent" or "Muller '747")

- U.S. Patent No. 8,246,979

- U.S. Patent No. 8,246,980

- U.S. Patent No. 8,617,591

SUF ¶ 10; DTX-78.

10.   I incorporate here, by reference, all findings of fact related to original Neupro and the

discovery of Form II as set forth in *UCB, Inc., et al. v. Watson Laboratories, Inc., et

al.*, C.A. No. 14-1083-SLR-SRF ("*UCB I*") Memorandum Opinion (D.I. 270).

**D.    The '589 Patent**

11.  The '589 Patent issued on November 20, 2018 and is titled "Polyvinylpyrrolidone for the Stabilization of a Solid Dispersion of the Non-Crystalline Form of Rotigotine." SUF ¶ 12.

12.  The '589 Patent expires on December 22, 2030.  SUF ¶ 13.

13.  The '589 Patent names Hans-Michael Wolff, Christoph Arth, Luc Quéré, and Walter Muller as inventors.  SUF ¶ 14.

14.  The '589 Patent issued from U.S. Patent Application No. 15/884,587, filed on January 31, 2018.  That application is a continuation of U.S. Patent Application No. 13/515,067, now U.S. Patent No. 9,925,150 ("the '150 Patent"), and claims priority to provisional application No. 61/289,302 filed on December 22, 2009.  SUF ¶ 15.

15.  Based on Actavis's filing of its ANDA, as noted above, UCB asserted infringement of claims 1, 2, 3, 7, 10, 11, and 12 of the '589 Patent.  D.I. 185 (infringement stipulation).

16.  Claim 1 recites: "A method for stabilizing rotigotine, the method comprising providing a solid dispersion comprising polyvinylpyrrolidone and a non-crystalline form of rotigotine free base wherein the weight ratio of rotigotine free base to polyvinylpyrrolidone is in a range from about 9:4 to about 9:6." SUF ¶ 16.

17.  Claim 2 recites: "A solid dispersion comprising a dispersing agent and a dispersed phase, said dispersed phase comprising rotigotine free base and polyvinylpyrrolidone wherein the weight ratio of rotigotine free base to polyvinylpyrrolidone is in a range from about 9:4 to about 9:6." SUF ¶ 17.

9

18.    Claim 3 recites: "The solid dispersion of claim 2, wherein the solubility of rotigotine free base in the dispersing agent is below 1 wt%." SUF ¶ 18.

19.    Claim 7 recites: "A pharmaceutical composition comprising a solid dispersion according to claim 2." SUF ¶ 19.

20.    Claim 10 recites: "A transdermal therapeutic system comprising a solid dispersion of claim 2." SUF ¶ 20.

21.    Claim 11 recites: "A method for preparing a transdermal therapeutic system, the method comprising preparing a solid dispersion comprising a dispersing agent and a dispersed phase, said dispersed phase comprising rotigotine free base and polyvinylpyrrolidone, wherein the weight ratio of rotigotine free base to polyvinylpyrrolidone is in a range from about 9:4 to about 9:6." SUF ¶ 21.

22.    Claim 12 recites: "The method of claim 1, wherein the solid dispersion further comprises a dispersing agent." SUF ¶ 22.

23.    The '589 Patent is directed to dispersed solid forms of rotigotine and PVP in a ratio of between 9:4 and 9:6 percent weight to percent weight ("w/w"). JTX-1 (the '589 Patent) at 15:54-64 (Claims 1 and 2), 16:26-32 (Claim 11).

24.    Certain dependent claims are directed to "pharmaceutical compositions" and TTSs. JTX-1 at Claims 1, 2, and 11.

25.   The '589 Patent explains that both Form I and Form II rotigotine can be used as the starting material for a solid dispersion. JTX-1 at 11:66-12:2; Tr. 116:17-20 (Rogers).[5] The '589 Patent also states that a "solid dispersion" is stabilized when it stays below 10% crystallization in a preferred embodiment, although there is preference for even less crystallization. JTX-1 at 3:12-18, 5:60-6:5; Tr. 162:7-15 (Rogers); *cf.* Tr. 606-608 (Myerson).

26.   The '589 Patent states that a matrix containing amorphous rotigotine "as a whole represents a metastable solid dispersion" because the amorphous form of rotigotine is metastable. JTX-1 at 3:12-18. It also states that a "solid dispersion" can hold up to 2% w/w water. JTX-1 at 12:4-10.

27.   The '589 Patent discloses one example, consisting of a series of analogs of original Neupro. This example uses a mixture of two silicone adhesives as the dispersing agent. Tr. 188:22-24, 189:10-11 (Rogers). Table 1 provides the composition of original Neupro, while Table 2 provides a series of analog samples with differing ratios of rotigotine to PVP, and Table 3 discloses the results of stability testing of the samples of Table 2 over a period of time. JTX-1 at 14:66-15:9, 15:28-42 (Table 3).

28.   Figure 1 of the '589 Patent purports to represent dissolution of the active pharmaceutical ingredient over time of the samples in Table 2. JTX-1 at 14:55-65. The assay used to generate data for Figure 1 did not involve skin or an artificial

---

[5] "Tr." refers to the Trial Transcript, D.I. 158. The name or names appearing in parentheses after references to the trial transcript are the names of the witness or witnesses whose testimony appears at the referenced pages of the transcript.

membrane, so it cannot be used to accurately predict flux – i.e., the release rate of an ingredient out of the patch – for real life applications and is meant only as a comparative, not objective reference. Tr. 723:1-724:4, 735:1-738:14 (Guy). Flux is an important measure of efficacy of TTSs, as it describes the amount of drug delivered into the user, over a set amount of time. *See id.*

29.    Figures 2 through 4 depict patches at various points of time over 24 months. JTX-1 at 15:10-19, 1.0004-6 (Figures 2-4). Sample 5 (a 9:4 patch) in the '589 Patent showed no crystals for 24 months at room temperature and was manufactured at least 24 months prior to December 2009, meaning no later than December 2007. Tr. 113:25-114:12 (Rogers), 712:4-14 (Quéré);[6] JTX-1 at 15:17-19. Table 3 of the '589 Patent reports no crystal formation for eight weeks. Tr. 123:8- 124:19 (Rogers). The '589 Patent lacks clinical or *in vivo* studies. Tr. 733:15-734:4 (Guy).

30.    The stability results stated in the '589 Patent are inconsistent with an internal UCB report. Tr. 122:10-12 (Rogers). That report contains stability data on an analogous patch to Sample No. 5 (9:4) in Figures 2 through 4 (20711044). It indicates that crystals appeared in the 9:4 patch after two weeks at various temperatures. *Compare* DTX-47.0009, *with* JTX-1 at 15:28-42 (Table 3) *and* JTX-1 at 15:10-16.

31.    A different report was identified as the source of the dissolution data in Figure 1. Tr. 713:10-714:19, 739:11-14 (Guy); FF, supra ¶ 4. That report showed that a 9:4 patch, which was associated with a different batch number than those associated with the

---

[6] Dr. Luc Quéré is a named inventor on the ' has been an employee of UCB since 1998. Tr. 686:4 (Quéré).

patches in Figures 2 through 4 of the '589 Patent, crystallized at eight weeks at 25 degrees Celsius, but crystallized at four weeks at 5 degrees Celsius. Tr. 128:12-129:3 (Rogers), 741:4-9 (Guy); *compare* DTX-55.0016, *with* JTX-1 at 15:28-42 (Table 3) *and* JTX-1 at 15:10-16.

32.    The '589 Patent does not disclose similar long term (i.e., 24 month) stability data for 9:5 or 9:6 TTSs.  JTX-1 at 15:10-50.

33.    The '747 Patent, one of UCB's Muller Patents, represents the closest prior art to the '589 Patent.  FF, infra ¶ 120.  It teaches and claims certain R:PVP ratios between 9:1.5 and 9:5. Tr. 397:19-398:16 (Prausnitz).  During prosecution of the '589 Patent and its parent, the '150 Patent, there was no substantive discussion of Muller '747, nor did the prosecuting attorney direct the Examiner to that patent specifically.  Tr. 404:20-406:3 (Prausnitz), 812:18-816:11 (Rakers).

34.    During her deposition, the prosecuting attorney acknowledged that there was a crystallization problem with the 9:2 patch and that it had been publicly known since at least November 2007, which contradicts a response to the Examiner that stated that the "prior art" did not recognize a problem with rotigotine crystallization in 9:2 TTSs. The prosecuting attorney said, however, that she meant to write "cited art" instead of "prior art."  Tr. 818:4-821:14 (Rakers); JTX-14 at 14.1240.

E.    **Transdermal Therapeutic Systems and Solid Dispersions**

35.    "Transdermal delivery" has been "extensively studied for [over] 40 years" and involves the administration of a pharmaceutical through human skin.  PTX-210 at 210.0001. Due to challenges in overcoming the barrier function of the skin, however,

13

there were by 2009 only about 40 marketed TTSs, delivering about 20 different kinds

of drugs. *Id*; DTX-184 at 184.0003 (Table 2).

36.   Numerous different TTS designs were known, including a "drug-in-adhesive" system,

which is several decades old. Tr. 451:5-11 (Prausnitz); PTX-214 at 214.0002 (Table

1). In drug-in-adhesive systems, the drug is present in "amorphous" (i.e., non-

crystalline) form and is incorporated into a dispersed phase of the TTS in a "solid

dispersion." Tr. 349:18-353:10 (Prausnitz). Original Neupro embodies such a

system, with amorphous rotigotine present in a solid dispersion within a silicone-

based polymer matrix. JTX-21 at 21.0006-7; Tr. 167:4-12 (Rogers).

37.   Amorphous material, such as amorphous rotigotine, is considered metastable. Tr.

98:5-15 (Rogers). The "metastable" form refers to a solid structure that is paused at a

higher energy state than the crystalline structure, but may potentially convert to a

lower energy state (the crystalline form) if "bump[ed]" or otherwise destabilized. *Id*.

This contrasts with an "unstable" form, which converts to the crystalline state

immediately and does not exist for more than a relatively transitory moment in time.

*Id*.

38.   In a TTS like Neupro, amorphous rotigotine largely resides undissolved alongside the

PVP in the "dispersed phase," with a small amount dissolved in the silicone

"continuous phase." Tr. at 349: 18-352:20 (Prausnitz), DDEM3-16. This is because

the rotigotine-free base has a solubility below 1% in these two phases. Tr. 156:9-14

(Rogers); JTX-15 at 15.0057. PVP acts as what is called a "dispersing agent" in the

14

system, where there is a continuous phase of rotigotine dissolved in silicone and a discontinuous phase of rotigotine dispersed by PVP. Tr. at 187:10-19 (Rogers).

39.    During use of Neupro, dissolved rotigotine leaves the continuous phase, goes out of the patch, across the skin, and into the user's bloodstream. Tr. 344:9-15 (Prausnitz). The dissolved rotigotine is continually replenished from rotigotine dispersed in PVP. Tr. 350:14-22, 351:25-352:12 (Prausnitz). A POSA would not expect PVP concentration to affect the flux (i.e., rate of drug delivery) from a TTS like Neupro because the rate-limiting step (i.e., slowest part of the process) of delivering rotigotine out of the patch to the patient is the rotigotine crossing the skin barrier, not the dissolution of rotigotine from the dispersed phase to the continuous phase. Tr. 350:23-352:24 (Prausnitz); 615:4-23 (Myerson); DDEM3-18. The job of the PVP is to maintain the amorphous rotigotine in the dispersed phase, i.e., in reservoirs, so that it may slowly replenish the continuous phase. Tr. 349:18-353:10 (Prausnitz).

40.    To deliver rotigotine effectively, a TTS must contain it in the amorphous form. Tr. 344:9-15 (Prausnitz).

41.    PVP is a polymer comprised of N-vinyl pyrrolidone monomers. Tr. 105:4-16 (Rogers). PVP was understood and used to stabilize the amorphous form of drugs in TTSs by preventing crystallization, including to inhibit crystallization of rotigotine in TTSs. DTX-118 at 118.0001, 118.0003, 118.0005 (Ma 1996); Tr. 348:9-349:10 (Prausnitz); JTX-6 (Schacht) at [0059]. PVP was used for this purpose in original Neupro. D.I. 110 at 4.

42.     Prior art taught that PVP could increase the amount of the active ingredient in the

amorphous state within the dispersed phase in a solid dispersion. JTX-9 (Braun) at

[0035]-[0037]; JTX-3 at 4:6-9.

43.     A POSA would thus expect that increasing the concentration of PVP in a TTS would

increase the stability of the amorphous drug. Tr. 583:24-584:14 (Myerson).

44.     One mechanism by which PVP stabilizes amorphous rotigotine is by increasing the

glass transition temperature ("$T_g$,") of the dispersion, i.e., the temperature at which an

amorphous solid changes from a rigid state to a more flexible, rubbery state. Tr.

229:6-10 (Rogers), 486:25-487:6 (Myerson). A POSA would expect that increasing

PVP concentration would increase the $T_g$ of the dispersion, thus allowing amorphous

rotigotine to stay in its more stable, rigid state at higher temperatures. *Id.* This tends

to improve long term stability of the drug.

45.     The $T_g$ of rotigotine was not disclosed in the prior art, including in the Tang reference,

which UCB has argued was the closest prior art. Tr. 577:24-578:3 (Myerson).

46.     PVP also stabilizes amorphous rotigotine by using hydrogen bonding to prevent

rotigotine molecules from bonding with each other, which is part of the crystallization

process. Tr. 105:4-106:1 (Rogers), 348:9-349:12 (Prausnitz), 584:15-587:10

(Myerson). The structures of both Form I and Form II rotigotine crystals involve a

hydrogen bond between two rotigotine molecules (i.e., intermolecular hydrogen

bonding). PVP would be expected to substitute itself in some of those pairings and

thus to prevent the formation of the bonds that lead to crystallization. FF, infra ¶¶ 115-116.[7] This adds stability to the amorphous form. Tr. 105:4-106:1 (Rogers).

### F.    Actavis's ANDA

47.    On or around November 26, 2013 Actavis submitted Abbreviated New Drug Application No. 206348 (the "Actavis ANDA") to the FDA, pursuant to 21 U.S.C. § 355(j), seeking approval to market a generic version of UCB's rotigotine TTS (1 mg/24 hours, 2 mg/24 hours, 3 mg/24 hours, 4 mg/24 hours, 6 mg/24 hours, and 8 mg/24 hours).[8]  JTX-15 at ¶ 14.

48.    UCB sued Actavis in 2014 for infringement of certain Orange Book listed patents, including the '434 Patent and U.S. Patent No. 8,232,414 ("the '414 Patent"), based on the filing of the Actavis ANDA and associated Paragraph IV certification.[9] *See UCB*

---

[7] Citations to "FF" refers to paragraphs within the findings of fact herein.

[8] The record does not reveal whether Actavis or a predecessor in interest was the actual applicant.  For purposes of this opinion, Actavis will be treated as the applicant.

[9] This Court has previously summarized how Paragraph IV Certifications fit within the Hatch-Waxman framework:

> The Hatch-Waxman Act ... provides a framework for the holders of pharmaceutical patents to enforce their patents against generic competitors.  When filing an ANDA, a generic manufacturer must certify whether its generic drug will infringe any patents listed in the Orange Book as being associated with the branded drug.    21 U.S.C. § 355(j)(2)(A)(vii).    For each listed patent, the ANDA applicant must make one of four possible certifications (respectively, the Paragraph I, II, III, and IV Certifications): (I) that no patent information on the branded drug has been submitted to the FDA; (II) that the patent has expired; (III) that the patent will expire on a stated date; or (IV) that the patent is

*I* (D.I. 61 (Amended Complaint naming Actavis) at ¶¶ 29-34, 41-47, 62-68). UCB

had also originally asserted the '747 Patent against Actavis but later provided a

covenant not to sue, and claims associated with that patent were removed from the

case. *Id.* (D.I. 61 at ¶¶ 48-54; D.I. 275 (stipulation of dismissal)). The '747 Patent

has since expired. The '434 and '747 Patents (again, referred to herein as the "Muller

Patents") are asserted as prior art in this case.

49.    It was decided *UCB I* that the '434 Patent was infringed and not invalid, but that the

'414 Patent was invalid. *Id.* (D.I. 270 at ¶¶ 1-2, 4). Those judgments were affirmed

on appeal. *UCB, Inc. v. Watson Labs. Inc.*, 927 F.3d 1272, 1291 (Fed Cir. 2019).

### G.    Person of Ordinary Skill in the Art ("POSA")

50.    A POSA has "knowledge of all prior art in the field of the inventor's endeavor and of

prior art solutions for a common problem." *In re Nilssen*, 851 F.2d 1401, 1403 (Fed.

Cir. 1988).

---

invalid or will not be infringed by the generic drug. 21 U.S.C.
§ 355(j)(2)(A)(vii)(I)-(IV). A Paragraph I or II Certification
poses no barrier to FDA approval, and one under Paragraph III
allows approval after the patent expires. 21 U.S.C.
§ 355(j)(5)(B)(i)-(ii). A Paragraph IV Certification, however,
makes the filing of an ANDA an act of patent infringement. 35
U.S.C. § 271(e)(2)(A). Along with a Paragraph IV
Certification, the applicant must provide notice to the patent
holder of its invalidity or noninfringement position. 21 U.S.C.
§ 355(j)(2)(B)(i). The patent holder has forty-five days after
receiving that notice to [invoke a thirty-month stay of FDA
approval of that ANDA by filing] a patent infringement suit.
21 U.S.C. § 355(j)(5)(B)(iii).

*Abbott Labs. v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408, 414-15 (D. Del. 2006).

51.    A POSA holds degrees in one of the pharmaceutical sciences, which includes

chemistry, medicinal chemistry, or a related field. Tr. 130:17-19 (Rogers), 331:19-20

(Prausnitz). A person with a Ph.D. degree and 1 to 2 years' experience or a person

with a Master's degree and 2 to 5 years' experience in one of these areas would each

be a POSA. Tr. 130:20-22 (Rogers), 331:20-23 (Prausnitz). A POSA would be

someone who works with a multidisciplinary team that has experience with and an

understanding of polymorphs and TTSs. Tr. 130:23-131:2 (Rogers), 331:24-332:1

(Prausnitz).

52.    The definition I have adopted here is largely consistent with that proposed by Actavis,

but experts for both sides testified that their opinions would remain the same

regardless of whether UCB's or Actavis's definition of a POSA were applied. Tr.

131:6-9 (Rogers), 332:6-12 (Prausnitz), 466:6-14 (Myerson), 717:9-12 (Guy).

### H.    Scope and Content of the Prior Art

#### 1.    Neupro

53.    Original Neupro was approved by the FDA in May 2007. It was sold by UCB

beginning in July 2007 and is prior art. Tr. 636:25-637:4, 637:11-15 (Hakes)[10];

JTX-21 at 21.0001; JTX-15 at 15.0012.

54.    Original Neupro's drug approval package was published online by the FDA on July 2,

2007 and is thus also prior art. Tr. 142:24-143:9 (Rogers); DTX-175 at 175.0001.

---

[10] Dr. Linda Hakes was employed by UCB. She had been employed at Schwarz
Pharma AG, which was later acquired by UCB in 2007. Dr Hakes left UCB in late 2015.
Tr. 635:8-11 (Hakes).

55. The length of therapy for the original Neupro patch was 24 hours. Tr. 133:4-7 (Rogers); JTX-21 at 21.0006.

56. Original Neupro contained commercially available silicone adhesives BIO-PSA Q7-4301 and Q7-4201. Tr. 155:21-156:1 (Rogers); JTX-1 at 13:27-40 (Table 1).

57. Original Neupro had an R:PVP ratio of 9:2 prior to application. Tr. 93:13-94:2, 94:16-19 (Rogers); JTX-11 at 11.0049. After original Neupro was applied to the skin of a patient, the R:PVP ratio decreased over time as rotigotine entered the patient from the patch. Tr. 133:8-17 (Rogers), 346:17-24 (Prausnitz). Original Neupro is a dynamic system, constantly delivering rotigotine to the skin. Tr. 167:8-169:4 (Rogers).

58. Some patches delivered 50% or more of the starting rotigotine content over a 24-hour period, and in the course of doing so reached and passed a R:PVP ratio of 9:4. Tr. 133:20-135:19 (Rogers), 616:21-617:1 (Myerson), 742:8-19, 745:19-747:11 (Guy); DDEM2-35.

59. For example, a set of 20 cm$^2$ original Neupro patches containing 9 mg of rotigotine and 2 mg of PVP, JTX-11 at 11.0049; Tr. 93:13-94:2 (Rogers), was studied 24 hours after application, and they had delivered, on average, 5.2 mg rotigotine, leaving 3.8 mg rotigotine in the patch. Tr. 143:11-21 (Rogers); Tr. at 746:12-747:9 (Guy); JTX-17 at 17.0908. At 24 hours, the R:PVP ratio was 3.8:2, or 9:4.7, on average. Tr. 134:3-135:19 (Rogers). Some original Neupro patches delivered more than 50% and had ratios of about 9:6 during the 24-hour treatment. Tr. 134:3-135:19, 151:22-152:1

(Rogers), 347:15-18, 452:1-12 (Prausnitz). These facts are undisputed. Tr. 552:8-11, 615:25-616:25 (Myerson).

60.    For purposes of this opinion, "apparent dose" refers to the amount of drug released from the patch into the patient over the course of therapy. *See* Tr. 140:3-19 (Rogers); 619:5-11 (Myerson). The apparent dose delivered by a patch is typically determined by measuring the amount of drug remaining in the patch after therapy and subtracting that from the amount in the patch before use. *See, e.g.*, Tr. 140:8-11 (Rogers); 746:9-19 (Guy). UCB studies on apparent dosages confirm that, during a 24-hour therapy period, original Neupro patches (including those made before and after the appearance of Form II) continued to deliver rotigotine. Tr. 135:13-19, 143:17-21, 145:20-146:6, 148:4-9, 150:17, 151:8-152:1 (Rogers), 459:15-21 (Prausnitz); JTX-17 at 17.0908; DTX-240 at 240.0102; DTX-238 at 238.0051.

61.    Original Neupro patches also continued to contain amorphous rotigotine, and thus, remained sufficiently metastable during therapy to deliver the drug. Tr. 159:5-19, 167:10-15, 242:18-243:2, 277:1-4 (Rogers). Absorption of water during therapy was not known to cause rotigotine crystallization. Tr. 164:15-22, 167:13-15 (Rogers); DTX-106 at 106.0001. And, in fact, original Neupro patches were expected to absorb water. Tr. 617:13-617:25 (Myerson); JTX-1 at 12:6-10. Indeed, Dr. Wolff, a '589 inventor and Neupro project head at UCB, stated that he never "observed such (new) crystal formation in the patch . . . in skin permeation studies nor after 24 h[our] patch application in vivo." Tr. 163:14-20, 164:9-165:1 (Rogers); DTX-106 at 106.0001; FF, infra ¶ 108.

21

### 2.    Appearance of Crystallization in Original Neupro

62.    Prior to 2007, the manufacturing process for original Neupro involved dissolving rotigotine free base in ethanol before mixing it with PVP. Tr. 115:16-21, 165:10-18 (Rogers); 620:24-622:15 (Myerson). Dissolution in ethanol took rotigotine out of its crystalline form. Tr. 116:10-12 (Rogers). In the finished patch, the rotigotine dispersed in PVP remains amorphous. Tr. 116:17-117:2, 167:10-15, 178:5-9 (Rogers).

63.    UCB processed a batch of rotigotine in August 2007. Tr. 621:23-622:6 (Myerson). The rotigotine from that batch precipitated out of the ethanol solution as a less soluble, new polymorph which, as noted earlier, is referred to as "Form II." Tr. 91:25-14 (Rogers), 637:16-638:10 (Hakes).

64.    Despite this change in rotigotine, UCB continued to make and sell original Neupro patches. JTX-15 at 15.0087-89; Tr. 639:16-640:16, 677:24-679:13 (Hakes). But patches made after the appearance of Form II and from certain laminate lots were prone to developing crystals, or "snowflakes," when stored at room temperature. JTX-15 at 15.0087-88; Tr. 283:10-285:16, 295:16-296:17 (Rogers). By October 2007, UCB suspected the cause of snowflake formation was the new polymorphic form of rotigotine. Tr. 573:1-4 (Myerson), 638:15-639:3, 672:6-673:17 (Hakes). In April 2008, UCB announced a recall of original Neupro from the U.S. market, after discussions with the FDA. SUF ¶ 7; Tr. 648:12-649:2 (Hakes).

65.    Dr. K. Ray Chaudhuri, a medical doctor specializing in Parkinson's Disease, published an article in 2008 reporting the cause of the recall – that the newly

identified Form II was more stable and less soluble as compared to Form I, making

amorphous rotigotine less stable. Tr. 108:15-109:8 (Rogers), 360:3-361:10; DTX-7 at

7.0001 (Chaudhuri); JTX-5 at 5.0001 (same). He had treated over 100 patients with

original Neupro with still no reports of crystallization, but recommended caution for

patients requiring larger doses of rotigotine, for which crystallization would be a

bigger concern. DTX-7 at 7.0003.

66.    Dr. Chaudhuri reported that, in Europe, original Neupro was still being used but, prior

to use, was kept in cold storage. Tr. 109:9-16 (Rogers); DTX-7 at 7.0002. "Cold

storage" means keeping the patches between 2°C and 8°C, but not frozen. Tr. 345:14-

24 (Prausnitz); *see also* Tr. 149:1-151:20, 207:21-208:8 (Rogers); DTX-238 at

238.0015 (Study Report for SP987); DTX-7 at 7.0001-2; JTX-11 at 11.049.

67.    The FDA asked UCB to create a compassionate use program, which provided 9:2

original Neupro to "patients [in the U.S.] who were deemed by their physicians to

need it." Tr. 677:24-679:18 (Hakes); DTX-84 at 84.0015. UCB complied, and the

program lasted from 2008 to 2012. Tr. 678:12-16 (Hakes).

### 3.    Reformulated Neupro

68.    Within weeks after the appearance of Form II rotigotine crystals, UCB identified

many possible solutions to the new crystallization problem with Neupro patches, one

of which was an increase in PVP concentration. Tr. 646:7-15 (Hakes). It appears,

from looking at the '589 Patent, and in particular at Figures 2 and 3, that patches with

9:2, 9:3, and 9:4 ratios were manufactured and placed on long-term (24-month)

stability testing by mid-November 2007. Tr. 112:18-114:12 (Rogers), 672:6-673:17,

23

528:11-530:17, 551:11-22 (Myerson); JTX-1 at 1.0001 (prov. filed Dec. 2009), 15:17-19 (24-month results). The 9:3 and 9:4 TTSs differed only in their R:PVP ratio from original Neupro (9:2). Tr. 113:3-17 (Rogers).

69. Dr. Luc Quéré, an inventor on the '589 Patent, investigated the $T_g$ of R:PVP mixtures in December 2007, after the 9:4 patches were already made and had entered testing, and UCB presented no evidence of earlier consideration of the $T_g$ of R:PVP mixtures. Tr. 701:13-703:9 (Quéré); PTX-296 at 296.0006. Dr. Quéré referred to the Neupro patch as embodying a "binary model," a term used to describe the amorphous solid dispersion of rotigotine in PVP discussed above. Tr. 690:4-23 (Quéré). The 9:4 ratio's stabilizing effect on the amorphous rotigotine is not explainable through Dr. Quéré's $T_g$ binary model calculations, which indicate that much more PVP should be needed to adequately raise the $T_g$. Tr. 704:13-705:16 (Quéré). Indeed, the calculations were not reported in the '589 Patent.

70. UCB applied for FDA approval of this 9:4 formulation (for reformulated Neupro). Tr. 95:19-22 (Rogers); JTX-11 at 11.0049.

71. In FDA filings, UCB referred to the change from 9:2 to 9:4 as "a slight modification to the quantitative composition of the patches" to ensure room temperature stability. DTX-455 at 455.0017; Tr. 119:17-120:1 (Rogers).

72. Reformulated Neupro is bioequivalent to original Neupro (meaning it has the same release rate and apparent dose) and was approved by the FDA without new efficacy studies. DTX-238 at 238.0010, 238.0023, 238.0050-51; Tr. 761:16-762:1 (Guy).

### 4.    The Muller Patents

73. Muller '434 (JTX-3) issued on April 26, 2005 from USSN 09/647,290, and is prior art to the '589 Patent. JTX-3 at 3.0001. Muller '434 expires this month, March 2021. JTX-22 at 22.0004.

74. In *UCB I*, UCB argued, and it was determined, that Actavis's ANDA filed on November 26, 2013 would infringe, *inter alia,* claim 15 of Muller '434. JTX-15 at 15.0007, 15.0059-60. Muller '434 currently underlies the injunction preventing the FDA from granting final approval of the Actavis ANDA.

75. Muller '434 claim 15 discloses and teaches a TTS having rotigotine free base in an amount effective to treat Parkinson's Disease, with PVP in the range of 1.5 to 5%. JTX-3 at 7:56-67 (Claim 1), 8:17-22 (Claim 5), 8:54-63 (Claims 14 and 15); Tr. 398:17-399:7 (Prausnitz). A POSA would readily understand that approximately 9% rotigotine free base is an amount effective for treatment of Parkinson's Disease. Tr. 445:13-447:20 (Prausnitz), 313:1-314:4 (Rogers).

76. Muller '747 (JTX-4) issued on August 19, 2008 from USSN 11/931,666 and is prior art to the '589 Patent. JTX-4 at 4.0001. Muller '747 is related to Muller '434 through divisional and continuation applications. *Id.*

77. Muller '747 expired in 2019. JTX-22 at 22.0004.

78. Muller '747 claim 14 discloses a silicone-based TTS with a ratio of 9% rotigotine to 1.5% to 5% PVP. Tr. 173:2-10 (Rogers); JTX-4 at 8:66-10:4 (Claim 14).

79. A POSA looking at Muller '747 claim 14 or Muller '434 claim 15 would envisage only a small and finite number of examples of TTSs with 9% rotigotine and 1.5 to 5% PVP. Tr. 173:2-21, 313:1-314:20 (Rogers), 366:19-367:10, 370:19-372:4, 376:16-

377:10, 398:10-399:7, 431:25-432:3 (Prausnitz), 599:4-601:23 (Myerson). A POSA
would envisage examples at whole and half integer percentages of PVP and would not
look in more granular detail. Tr. 371:3-10 (Prausnitz); 673:11-677:13 (Hakes).
Included in this set are a TTS with 9% rotigotine and 4% PVP, and a TTS with 9%
rotigotine and 5% PVP, meaning 9:4 and 9:5 R:PVP ratios respectively. Tr. 599:4-
601:23 (Myerson).

80.  The range of R:PVP ratios in the Asserted Claims in this case and the like range in the
Muller Patents' claims significantly overlap and there is no meaningful difference in
how a POSA would view them. Tr. 398:2-399:7 (Prausnitz).

81.  Based on PVP chemistry and prior art rotigotine TTS disclosures, a POSA would see
only a finite number of whole or possibly half number integer configurations, within
the 9:1.5 to 9:5 range of ratios. Tr. 370:19-372:4 (Prausnitz), 673:11-677:13 (Hakes).

82.  Muller '747 claim 14 covers reformulated Neupro (9:4), and Sample No. 5 (9:4) of
the '589 Patent. Tr. 409:15-17 (Prausnitz), 669:24-670:14 (Hakes), 178:21-179:6
(Rogers); JTX-1 at Table 2. The same is true for Muller '434 claim 15. Tr. 313:1-
314:4 (Rogers).

83.  The Muller Patents are owned and controlled by UCB and were listed in the Orange
Book as covering reformulated Neupro. JTX-22 at 22.0004 (2014 Orange Book); Tr.
172:13-24 (Rogers), 396:11-397:13, 409:1-17 (Prausnitz), 668:4–670:14 (Hakes);
JTX-4 at 4.0001; JTX-3 at 3.0001.

84.  The Muller Patents' specifications are materially the same. Tr. 181:8-19 (Rogers).

85.   The Muller Patents teach a POSA to make and use TTSs for the treatment of
Parkinson's Disease with rotigotine free base as the active ingredient and PVP as a
crystallization inhibitor. JTX-4 at 1:21-26, 6:16-44 (Example 2), 4:30-41, 8:66-10:4
(Claim 14); Tr. 367:11-16 (Prausnitz). These TTSs have identical quantitative and
qualitative compositions as those disclosed in the '589 Patent, and the underlying
experimentation was carried out before Muller filed his patent application in 1999,
nearly a decade before the '589 priority date. Tr. 342:10-343:6, 362:8-11 (Prausnitz),
663:19-665:23 (Hakes).

86.   The Muller Patents' Example 2 describes the process for making a TTS having 9%
rotigotine free base and 3% PVP, differing from the Asserted Claims only as to the
R:PVP ratio. Tr. 312:9-313:8 (Rogers), 366:3-14 (Prausnitz); JTX-3 at 5:54-6:14
(Example 2); JTX-4 at 6:16-44 (Example 2).

87.   The Muller Patents teach that the PVP can be 1.5% to 5% in a TTS having up to 15%
rotigotine. JTX-3 at 4:6-16; JTX-4 at 4:30-41.

88.   The TTS of Example 2 in the Muller patents comprises a mixture of the same two
silicone adhesives in original Neupro and the '589 Patent. Tr. 174:1-16, 322:18-25
(Rogers); JTX-3 at 5:54-6:14 (Example 2); JTX-1 at 13:27-39 (Table 1).

89.   Muller '747 teaches a POSA to make and use 9:4 and 9:5 TTSs within the scope of
claim 14 of that patent by adapting the 9:3 TTS from Muller Example 2 by increasing
PVP in the patch to 4% or 5%. Tr. 372:5-16, 376:16-378:8, 379:16-24 (Prausnitz).

90.   Such a TTS is the same as the TTS of the Asserted Claims, regardless of the
appearance of Form II. Tr. 176:5-18 (Rogers), 599:19-602:3 (Myerson).

91.    The Muller Patents disclosed Franz Diffusion Cell studies using human skin.[11]  Tr. 365:6-23, 367:17-370:18 (Prausnitz).  Specifically, Figure 1 shows permeation data for the 9:3 patch of Example 2, which had 300 μg/cm$^2$ permeation over 24 hours.  Tr. 388:20-391:21 (Prausnitz); JTX-4 at 4.0002 (Figure 1), 5:28-38, 6:16-44 (Example 2 (9:3 TTS)).

92.    The Muller Patents teach TTSs that deliver sufficient amounts of rotigotine to patients for therapy, the preferred TTS containing 9% rotigotine. JTX-3 at 4:13-17, 4:38-42, 5:5-7; 5:29-38.

### 5.    Braun

93.    Braun, International Pub. No. WO 2006/039532 to Braun et al., is a World Intellectual Property Organization ("WIPO") Patent Cooperation Treaty ("PCT") application and was published on April 13, 2006. JTX-9 at 9.0001.  It is prior art to the '589 Patent. The applicant was Schwarz Pharma, Inc., which was acquired by UCB. *Id.*; Tr. 180:5-13 (Rogers).

94.    Braun teaches that TTSs "may be prepared using methods known in the art or as described in [Muller '434]." JTX-9 at [0029]; Tr. 181:8-13 (Rogers); FF, *supra* ¶ 86.

95.    Braun teaches that 9% rotigotine is "effective for the treatment of the symptoms of Parkinson's Disease or restless legs syndrome…." JTX-9 at [0036].  Braun also teaches that "[t]he TTS may also further comprise additives [such as PVP] . . . that

---

[11] A Franz Diffusion Cell is used to artificially simulate the transdermal drug delivery process through human skin, using a piece of human or animal skin and measuring the amount of drug that passes through during a set amount of time. Tr. 368:2-9 (Prausnitz).

facilitate a homogenous dispersion of rotigotine particles." JTX-9 at [0036]; *see also* Tr. 182:25-183:4 (Rogers). Braun further teaches that PVP "is present in the active substance-containing matrix layer in the form of insoluble particles at a concentration of 1.5[% to ]5%." JTX-9 at [0037]; *see also* Tr. 183:8-13 (Rogers). Therefore, Braun teaches a TTS with a range of R:PVP ratios from 9:1.5 to 9:5. JTX-9 at [0035]-[0037]; Tr. 385:11-386:9 (Prausnitz).

96.    Braun Table 1 discloses a preferred TTS that differs from the Asserted Claims only with respect to the claimed ratio – disclosing a preference for a 9:2 ratio of rotigotine to PVP. JTX-9 at 9.0073 (Table 1); Tr. 182:2-6 (Rogers). Table 1 of Braun teaches the same mixture of two silicone adhesives as Muller '434 and the '589 Patent. JTX-9 at [0035], Table 1; JTX-1 at 9.0013 (Table 1); FF, *supra* ¶ 88.

97.    A POSA, looking at those disclosures in Braun, would envisage only a limited and finite number of TTSs with 9% rotigotine and between 1.5% and 5% PVP. Tr. 183:14-23, 315:14-316:2 (Rogers). Included in this group is a TTS with 9% rotigotine and 4% PVP and a TTS with 9% rotigotine and 5% PVP. *Id.* These TTSs necessarily have R:PVP ratios of 9:4 and 9:5, respectively. *Id.*

98.    Braun teaches and enables a POSA to make and use a solid dispersion having a 9:4 or 9:5 R:PVP ratio that falls within the scope of the Asserted Claims. Tr. 372:5-16, 376:16-378:8, 379:16-24 (Prausnitz). This is true regardless of the appearance of Form II. Tr. 395:2-396:10 (Prausnitz).

99.    Braun's TTS had a "controlled rate" of release, which is important for the efficacy of this drug. JTX-9 at [0045]; Tr. 381:4-382:3 (Prausnitz). From this fact, a POSA

would understand that changing the PVP concentration would not change the release rate because, as rotigotine diffuses out of the patch, the amount of PVP in the R:PVP ratio rises. Because the rate of drug delivery remains constant, starting with a patch at a somewhat higher PVP concentration should not change the effectiveness of drug delivery from the TTS. Tr. 386:3-388:19 (Prausnitz).

### 6. Lauterbach '778

100. Lauterbach '778, International Pub. No. WO 2002/089778 to Lauterbach et al., is a WIPO PCT application and was published on November 14, 2002. JTX-7 at 7.0001. It is prior art to the '589 Patent. The applicants were Schwarz Pharma AG (now UCB) and Lohman Therapie-Systeme AG. *Id.*; Tr. 136:20-23 (Rogers).

101. Lauterbach '778's discloses an example demonstrating how to prepare a TTS with a 9:2 R:PVP ratio. Tr. 138:3-11 (Rogers); JTX-7 at 7.0014-15.

102. This 9:2 TTS differs from the Asserted Claims only with respect to the claimed R:PVP ratio. JTX-7 at 7.0014-15; Tr. 384:7-385:10 (Prausnitz). The disclosed TTS includes a mixture of the same two silicone adhesives as the '589 Patent. *Id.*; JTX-1 at 13:27-39 (Table 1).

103. Patches made according to the preparation method described in Lauterbach '778 were unlikely to crystallize at room temperature due to a chloride impurity, because the method described in Lauterbach '778 uses a salt of rotigotine rather than the free base. Tr. 623:5-16 (Myerson), 165:10-22 (Rogers). Chloride impurities inhibit crystallization. Tr. 166:1-3 (Rogers); JTX-15 at 15.0021.

104. Lauterbach '778 discloses a clinical trial using an example of a 9:2 TTS, JTX-7 at 7.0015; Tr. 382:4-20 (Prausnitz), which a POSA would know is the original Neupro formulation. Tr. 138:1-11 (Rogers).

105. Lauterbach '778 teaches that the apparent dose "is usually 50 percent and [may be] as high as 80 to 90 percent of the drug amount that's originally in the TTS." Tr. 137:11-15 (Rogers); JTX-7 at 7.0010.

106. Lauterbach '778 teaches the apparent dose of patches described in its example for one silicone patch is 5.18±1.23 mg. JTX-7 at 7.0017; Tr. 138:14-19; 139:20-140:2 (Rogers). Over half of the patients received more than 50% of the rotigotine. Tr. 743:8-744:18 (Guy).

107. The 9:2 patches described in Lauterbach '778 would have released a constant amount during therapy, which again, would indicate to a POSA that increasing PVP concentration would not change release rate. Tr. 748:1-749:2 (Guy); FF, supra ¶ 99.

108. Lauterbach '778 reports data from UCB Clinical Study SP502. JTX-7 at 7.0016-18; Tr. 138:3-139:12 (Rogers). The SP502 study confirms the teaching in Lauterbach '778, namely that the TTSs reached a ratio of 9:4 and beyond during 24-hour therapy, and continued to deliver rotigotine. Tr. 141:1-9 (Rogers); DTX-108 at 108.0981, 108.0110.

### 7. Schacht

109. Schacht, USSN 10/623,864, published as U.S. Patent Pub. No. 2005/0079206 on April 14, 2005. JTX-6 at 6.0001. Schacht is prior art to the '589 patent.

110.    Schacht is assigned to UCB, JTX-6 at 6.0001, and issued as U.S. Patent No. 8,617,591, which was listed in the Orange Book for reformulated Neupro.  JTX-2 at 2.0813; SUF ¶ 10.

111.    Schacht discloses PVP as a "particularly preferred" crystallization inhibitor that is "pharmaceutically acceptable and approved for use in medicaments."  JTX-6 at [0059].

112.    Schacht presents a working example of a 9:2 TTS, Example 1, which differs from the Asserted Claims only with respect to the claimed R:PVP ratio.  JTX-6 at [0059], [0068]-[0069]; Tr. 384:21-385:10 (Prausnitz).  The *UCB I* Court found that "the ingredients in patches made by Schacht Example 1 and original Neupro are the same."  JTX-15 at 15.0019.

113.    Schacht reports that the 9:2 patch of Example 1 had $360\pm60$ $\mu g/cm^2$ permeation in 24 hours.  JTX-6 at 6.0008 (Figure 7), [0103]; Tr. 388:20-391:21 (Prausnitz).  As noted below, this supports that flux remained consistent even after the patch reached a 9:4 and 9:5 R:PVP ratio in therapy.

### 8.    The '460 Publication

114.    USSN 12/324,166 was filed on November 26, 2008 and published as U.S. Patent App. Pub. No. 2009/0143460 ("the '460 Publication"), on June 4, 2009.  JTX-16.  The '460 Publication eventually issued as the '414 Patent that was asserted and found invalid in *UCB I*.  DTX-75; JTX-15 at 15.0090.  The '460 Publication is prior art to the '589 Patent.

115. The '460 Publication disclosed that Form II rotigotine could be prepared in a TTS "according to methods commonly known in the state of the art." JTX-16 at [0071], [0073]; Tr. 358:10-358:22 (Prausnitz), 705:25-708:18 (Quéré) (confirming disclosures in the '414 Patent were true as of its filing date).

116. The '460 Publication discloses that Form I and Form II crystal structures require intermolecular hydrogen bonds between the phenol of one rotigotine molecule and the amine of another.  Tr. 101:6-104:23, 107:23-108:3 (Rogers), 352:16-358:5 (Prausnitz); JTX-16 at [0048], 16.0002-3 (Figures 2 and 3).  Inhibition of this hydrogen bonding inhibits crystal formation of either form. *Id.*

### 9.    Tang

117. USSN 12/475,390 was filed on May 29, 2009 and published on December 3, 2009 as U.S. Patent App. Pub. No. 2009/0299304 ("Tang," as noted in the Introduction).

118. Tang discloses TTSs containing multiple possible drugs, but focusing on working examples of scopolamine, which is often prescribed to treat motion sickness.  JTX-8 at [0021], [0100], [0104]; Tr. 402:2-19 (Prausnitz).  Tang does not disclose working examples with rotigotine as the active ingredient nor does it mention polymorphic forms of rotigotine.  JTX-8 at [0100]-[0105] (Examples 1-15).

119. Tang does not disclose the $T_g$ of rotigotine free base or hydrochloride. Tr. 578:4-6 (Myerson).

120. Tang is not the closest prior art to the '589 Patent.  The Muller Patents are because, unlike Tang, they disclose and claim TTSs with R:PVP ratios of 9:4 and 9:5.  FF, *supra* ¶¶ 75, 78-79; Tr. 400:21-401:20, 402:20-403:2 (Prausnitz).

33

## I.    Prosecution of the '589 Patent

121. During prosecution of the '150 Patent, which is the parent to the '589 Patent,[12] and

similarly during the prosecution of the '589 Patent itself, the Examiner relied on four

main references: Hannay; Wang; Ma; and Tang.  The Examiner asserted that:

(1) Hannay and Wang taught rotigotine transdermal systems with 9% rotigotine and

2% or 3% PVP, (2) Wang disclosed a range of 9:0.6 to 9:9, and (3) Ma disclosed that

PVP was a known crystallization inhibitor.  *See, e.g.*, JTX-14 at 14.0569-76; JTX-2 at

2.0072-84; Tr. 497:20-499:25 (Myerson); PTX-44A.  Hannay is substantially the

same disclosure as Schacht (JTX-6).  The Muller Patents (JTX-3 & JTX-4),

Lauterbach '778 (JTX-7), and Schacht (JTX-6) were noted but not substantially relied

on by the Examiner during prosecution.  Tr. 425:3-24, 430:13-431:2 (Prausnitz); '150

Patent, References Cited.

122. During the '589 Patent prosecution, the Examiner cited references explaining the

crystallization problem experienced by original Neupro and the subsequent recall of

original Neupro.  JTX-2 at 2.0302-28, 2.0386, 2.0391; Tr. 413:25-418:4 (Prausnitz).

UCB also cited, and the Examiner considered, invalidity contentions submitted in

another case, *UCB, Inc., et. al. v. Zydus Worldwide DMCC, et. al.*, No. 16-1023

(LPS), which set forth many of the same arguments relied upon by Actavis in the

present case.  JTX-2 at 2.0677-852, 2.0857.

---

[12] The '150 Patent was filed on July 12, 2012, and issued on March 27, 2018
(JTX-14), while the '589 Patent was filed as a continuation thereof on January 31, 2018
and issued on November 20, 2018 (JTX-2).

123. The '589 Examiner withdrew his rejections and allowed the claims after focusing on Tang (JTX-8). JTX-2 at 2.0652-59; Tr. 418:5-420:21 (Prausnitz). The '150 Examiner also found that Tang was the closest prior art. JTX-14 at 14.1381-82; Tr. 500:1-6, 501:2-502:9 (Myerson).

124. Following both the '150 Examiner's and the '589 Examiner's rejection over Tang, UCB submitted the declaration of co-inventor Dr. Luc Quéré. JTX-2 at 2.0291-96; JTX-14 at 14.1352-54, 14.1365-66. Dr. Quéré's declaration provided his measured $T_g$ values for rotigotine free base (9° C) and rotigotine HCl (76 °C). *Id.*; Tr. 508:14-510:3 (Myerson). The '589 Examiner agreed with UCB that rotigotine free base thus has what Tang called a low glass transition temperature, while rotigotine HCL has what Tang called a high glass transition temperature, leading to the expectation, under Tang that the claimed ratios of rotigotine free base to PVP would not provide long-term stability. JTX-2 at 2.0658. Thus, the '589 Examiner concluded that Tang taught away from the ratios of R:PVP claimed in the '589 Patent. JTX-2 at 2.0658-59.

### J. A POSA Would Be Motivated by the Prior Art to Select 9:4 and 9:5 TTSs

125. Working examples of TTSs having a 9:2 R:PVP ratio are taught by Braun, Lauterbach '778, and Schacht. FF, *supra* ¶¶ 96, 101, 112. The Muller Patents disclose the same, as well as a working example of a TTS having a 9:3 R:PVP ratio. FF, *supra* ¶ 86. These 9:2 and 9:3 examples, as well as the 9:2 original Neupro (collectively, the "Prior Art TTS Examples"), are the same as the Asserted Claims here, but for the

R:PVP ratio. FF, supra ¶¶ 85-86, 96, 102, 112. A POSA seeking greater rotigotine stability following the discovery of Form II would have been motivated to modify the Prior Art TTS Examples by selecting a 9:4 or 9:5 ratio. FF, infra, ¶¶ 126, 128-132. Such modification would meet all Asserted Claim elements.

126. The knowledge that original Neupro started having incidences of crystallization at room temperature, but not in cold storage, would motivate a POSA to increase the concentration of PVP. Tr. 374:2-11, 382:23-383:8, 384:1-14 (Prausnitz); FF, supra ¶¶ 63-67. This is because a POSA would know that PVP would inhibit crystallization through both hydrogen bonding and an increase of $T_g$. FF, supra, ¶¶ 46, 69, 116.

127. Original Neupro was well-known in the prior art, and its composition could be derived from disclosures of clinical trial formulations in Lauterbach '778 or Schacht. FF, supra ¶¶ 104, 112-113. A POSA would also review formulations in the Orange Book patents in 2007-2008 associated with it. JTX-23 at 23.0004 (listing Muller Patents); Tr. 333:9-335:25 (Prausnitz). A POSA would also find substantially the same formulation as original Neupro appearing in Schacht, Braun, and Lauterbach '778. Tr. 342:10-343:6; 375:12-376:4, 383:10-25, 384:21-385:10 (Prausnitz); FF, supra ¶¶ 96, 101, 112.

128. A POSA would have knowledge from prior art such as the Chaudhuri article and the '460 Publication that original Neupro had been recalled in the U.S. due to crystallization of rotigotine, and that Form II was less soluble than Form I. FF, supra ¶¶ 65, 116; DTX-7 at 7.0001-2; JTX-16 at [0051]; Tr. 109:2-16 (Rogers). Thus, a POSA would have been motivated by scientific principles (PVP's stabilizing effect)

to adjust the Prior Art TTS Examples to increase the stability of amorphous rotigotine.

Tr. 111:21-112:7 (Rogers), 378:20-379:15, 407:15-23 (Prausnitz), 674:22-676:11

(Hakes).  A POSA would be further spurred to adjust PVP upward based on claims in

the Muller Patents.  Those higher concentrations of PVP would include 4% and 5%.

FF, supra, ¶¶ 79, 81, 89.

129.  PVP was known in the prior art as an effective crystallization inhibitor for rotigotine

in TTSs, and one that could be optimized by adjusting its concentration.  FF, supra

¶¶ 41-46.  A POSA would be motivated to adjust PVP content to 4% or 5% based on

the teachings of Braun or the Muller patents, while maintaining the rotigotine content

at 9%.  Tr. 382:23-383:8, 384:1-14, 391:5-19 (Prausnitz), 111:2-112:7 (Rogers).

130.  The known processes for making a 9% rotigotine Neupro TTS would serve as the

basis for a POSA making simple analogs with the same rotigotine content but a higher

PVP content.  Tr. 374:12-375:11, 376:5-13, 407:15–23 (Prausnitz).  Muller '747

described a method of making a 9:3 patch, which a POSA could adapt to make a wide

range of analogs.  FF, supra ¶ 89.

131.  A POSA would be motivated to make patches with whole integer ratios (i.e., 9:4 or

9:5) based on knowledge that increasing PVP by 1% increases stability of amorphous

rotigotine and based on the examples of whole number integer concentration ratios in

the prior art.  Tr. 370:19-372:4 (Prausnitz), 673:11-677:13 (Hakes), 751:4-755:9

(Guy); JTX-35 at 35.0003-4.

132.  A POSA, knowing that increasing PVP would increase stability, would be motivated

to increase PVP by the minimum amount necessary to stabilize the patch and would

look to the Muller Patents for the suggestion of 9:4 and 9:5 R:PVP patches.  Tr. 751:15-23 (Guy); Tr. 673:11-677:13 (Hakes), 376:17-370:18 (Prausnitz).

133.  The simplicity of the possible modifications would motivate a POSA to find a ratio within the range taught by the Muller patents and Braun.  Experimenting with new ratios, such as 9:4 and 9:5, would require nothing but routine procedures (e.g., manufacturing, preparing, and observing stability or release).  Tr. 120:11-121:24, 370:19-372:4, 376:16-377:20, 384:15-20, 391:5-21 (Prausnitz); JTX-1 at 14:35-38.

134.  A POSA would understand that only relatively minor change was needed to address crystallization of original Neupro, as it was still marketed in Europe in cold-chain storage, and thus, a POSA would understand that a relatively small increase in stability could inhibit crystallization at room temperature.  Tr. 109:9-22, 111:4-112:7 (Rogers), 344:16-346:5, 392:17-393:4 (Prausnitz); JTX-5 at 5.0002.  A POSA would further understand that cold storage inhibits crystallization in a similar manner as increasing PVP content: by reducing molecular mobility of rotigotine and preventing hydrogen bonding.  Tr. 109:9-22, 295:19-296:18 (Rogers); FF, supra ¶¶ 41-46, 116.

135.  The assertion by UCB and UCB's expert, Dr. Allan Myerson (FF, supra ¶ 4), that a POSA would have been dissuaded from trying the 9:4 or 9:5, instead focusing on a ratio of approximately 9:18 based on $T_g$ calculations, are contrary to Actavis's more credible evidence and testimony, and are contradicted by UCB's own experience.  Tr. 520; FF, supra ¶ 62, 68-69.

136.  UCB identified increasing PVP as a leading solution and formulated 9:4 patches within a few weeks of confirming the appearance of Form II crystals.  FF, supra

¶¶ 63, 68-69. There is no evidence that the inventors investigated the $T_g$ of R:PVP mixtures prior to December 2007, which was after they made their 9:4 analogs. Tr. 701:13-703:9 (Quéré); PTX-296 at 296.0006.

137. A POSA would have the objective of improving upon the prior art, and would have a strong interest in exploring ratios of R:PVP within the range disclosed to be effective (9:1.5-9:5), to provide a better product. Tr. 372:23-374:1, 377:21-379:24 (Prausnitz); FF, supra ¶¶ 75, 78-79, 85, 95. Thus a POSA would likely make a 9:4 or 9:5 patch and possess a TTS within the scope of the Asserted Claims.

### K.    Reasonable Expectation of Success of 9:4 or 9:5 TTSs

138. A POSA would have a reasonable expectation of success in making and using 9:4 or 9:5 TTSs because the Muller Patents and Braun expressly teach their therapeutic effectiveness. FF, supra ¶¶ 90, 92, 95. Further, 9:4 and 9:5 TTSs are two of the first three whole integer PVP concentration steps above the 9:2 and 9:3 Prior Art TTS Examples, which were proven effective in clinical trials. Tr. 385:11-394:13 (Prausnitz).

139. A POSA would be working from a significant body of knowledge on rotigotine TTS design, based on original Neupro and related patents. By 2009, the state of the art included numerous patents and publications reporting on such patches, including the Prior Art TTS Examples. Tr. 338:9-340:18, 378:9-379:15, 391:5-21 (Prausnitz).

140. A POSA would expect that 9:4 and 9:5 TTSs, falling with the scope of Muller '747 claim 14 and/or of Muller '434 claim 15, would be suitable to therapeutically deliver rotigotine. Tr. 365:6-23 (Prausnitz), 173:25-175:18 (Rogers).

141.   The expectation that a TTS containing amorphous rotigotine would be therapeutically effective would not change after the appearance of Form II crystals. Tr. 396:1-10 (Prausnitz), 601:14-23 (Myerson).

142.   The flux of a 9:4 or 9:5 TTS would not be expected to change because the Muller Patents and Braun each taught that 9:1.5 to 9:5 would be effective TTSs to treat Parkinson's Disease. FF, supra ¶¶ 75, 79, 80, 83, 85; JTX-4 at 4:28-42, 6:16-44 (Example 2), 8:66-10:4 (Claim 14); Tr. 367:17-370:18, 385:2-17 (Prausnitz), 173:2-175:18, 181:20-184:25 (Rogers). The Muller Patents taught that the PVP in 9:4 and 9:5 R:PVP ratios would not adversely affect the physical properties of the TTS. FF, supra ¶¶ 79-80, 92.

143.   Further, a POSA would understand that the rate-limiting step of the therapy was the passing of rotigotine through the skin. Slight increases in PVP would not influence the rate of that step because PVP was used only to maintain reservoirs of amorphous rotigotine in the dispersed phase. Diffusion of amorphous rotigotine from the dispersed phase into the silicone continuous phase is a rapid step, independent of the PVP concentration. Tr. 350:23-352:24 (Prausnitz), 615:5-23 (Myerson); FF, supra ¶ 39.

144.   A POSA would know of the low saturation limit of rotigotine in a silicone adhesive and the relative surplus of rotigotine in the R:PVP complexes, so when the R:PVP ratio is raised from 9:2 to 9:4, the amount of rotigotine available remains well above that limit. Thus, POSAs would expect satisfactory drug release from patches with

40

R:PVP ratios of 9:4 or 9:5.  Tr. 350:10-353:13 (Prausnitz), 755:11-757:2 (Guy); FF, supra ¶¶ 38-39 (explanation of dissolution and dispersion of rotigotine).

145.    A POSA would know that original Neupro could deliver more than half of its starting rotigotine content in 24 hours of use (and up to 80-90%), meaning a POSA would know that a 9:2 patch would become the weight-ratio equivalent of a 9:4 patch during the first 24 hours of use.  Tr. 137:6-25, 138:12-25 (Rogers), 342:5-9, 347:2-14, 348:1-8, 387:15-388:19, 451:19-452:12, 459:15-460:1 (Prausnitz), 615:25-617:12 (Hakes); FF, supra ¶¶ 58-59; JTX-17 at 17.0908.

146.    A POSA would see no significant difference in permeation between the Schacht 9:2 and Muller 9:3 patches.  FF, supra ¶¶ 91, 113; Tr. 388:20-391:21 (Prausnitz).  Further, measuring drug permeation in such *in vitro* models was routine for a POSA.  Tr. 367:3-16 (Prausnitz).

147.    A POSA would not have expected that the *in vivo* release rate would change at the claimed ratios of 9:4 to about 9:6 relative to 9:2 to 9:4, which UCB itself characterized as a "slight" quantitative change.  DTX-455 at 455.0015-17; Tr. 361:15-363:2 (Prausnitz), 118:4-120:10 (Rogers), 530:2-17 (Myerson).

148.    The 9:4 and 9:5 patches that would be created by a POSA, as claimed by the Muller or Braun Patents, would be the same as those described and claimed in the '589 Patent, including after appearance of Form II, and would therefore have the same permeation rates and stability as a TTS of the Asserted Claims.  Tr. 394:22-396:10 (Prausnitz), 600:8-602:3 (Myerson).

149.   With regard to stability, based on the reported prevention of crystallization with cold-chain storage of 9:2 patches, a POSA would have a reasonable expectation that a relatively small adjustment in PVP content could increase stability at room temperature. Tr. 111:4-112:7 (Rogers), 392:17-393:4 (Prausnitz), 587:18-589:25 (Myerson).

150.   UCB's expert Dr. Myerson agreed that a POSA would have a reasonable expectation of success of making a 9:4 patch based on claim 14 of the '747 Patent, keeping it in cold storage. Tr. 592:1-594:6 (Myerson).

151.   Dr. Myerson also conceded that a POSA reading Muller '747 after the appearance of Form II could still make a 9:2, 9:3, 9:4, and 9:5 patch, and that the rotigotine in such patches would not crystallize immediately. Tr. 594:7-24, 595:7-596:17, 599:4-600:7 (Myerson).

152.   Lauterbach '778, Braun, Schacht and the Muller Patents taught that the disclosed TTSs delivered rotigotine at the expected rate, causing a POSA to understand that there would be no extensive crystallization even as they approached or exceeded 9:4. Tr. 431:16-24, 432:22-434:21 (Prausnitz); FF, supra ¶¶ 92, 99, 107, 113.

153.   POSAs would expect that simple analogs of original Neupro with increased PVP would show less crystallization than original Neupro. Tr. 374:2-375:11 (Prausnitz).

154.   A POSA would also expect the same stability described by the '589 Patent and could confirm its stability with minimal effort – by making a patch and observing it. Tr. 175:23-179:13, 184:4-18 (Rogers), 600:8-602:3 (Myerson).

155.    The knowledge that PVP is a crystallization inhibitor and solubility enhancer with a concentration-dependent effect would provide a POSA with a reasonable expectation that a Neupro-like TTS would be more stable with a 9:4 or 9:5 ratio than a similar system having a 9:2 ratio. Tr. 378:9-379:15, 385:11-386:9 (Prausnitz); FF, supra ¶ 41.

156.    A POSA would expect a 9:4 ratio to increase the stability of amorphous rotigotine because Form II crystals, like Form I, require a specific hydrogen bond that can be inhibited by PVP to an increasing degree based on increased PVP concentration. At 9:4, there is at least one N-vinylpyrrolidone monomer unit of PVP available to interact with each rotigotine molecule, thereby inhibiting formation of the hydrogen bonds underlying crystallization. Tr. 391:22-394:8 (Prausnitz).

L.    **Facts Relating to Secondary Considerations**[13]

---

[13] Over two months after the trial concluded, UCB requested that, pursuant to Federal Rule of Evidence 201, I take judicial notice of International Application Publication No. WO 2011/048491, a patent application filed by Actavis. D.I. 176. UCB claimed that a specific disclosure within that patent application contradicts Actavis's arguments that there was no long felt but unmet need for the claimed invention. D.I. 176 at 2-3. I will not take judicial notice of that application, especially because UCB asks not only that I take notice of the existence of the application but that I rely on UCB's characterization of specific technical disclosures to assess secondary indicia of nonobviousness. *See Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1378 (Fed. Cir. 2017) ("Because the scientific premise behind the 'newly characterized antigen' test stated in the instruction in this case was neither 'generally known' nor 'accurately and readily' ascertainable, we cannot take judicial notice of the premise and displace the required fact finding with what amounts to a rule of law."); *In re Peregrine Sys., Inc.*, 311 B.R. 679, 692 (Bankr. D. Del. 2004) ("Because a court may take judicial notice of 'matters of public record,' and it is not unfair to Copley to do so, I will take judicial notice of these documents. However, I will take judicial notice only of the existence and contents of these documents, without making any determination regarding the truth of any facts represented therein." (citations omitted)). As Actavis points out, UCB "should have

157.   Prior to the product recall occasioned by the appearance of Form II rotigotine crystals,

the Prior Art TTS Examples, including original Neupro, satisfied patients' needs.

After the appearance of Form II, UCB distributed original Neupro through cold

storage for sale in Europe and under a compassionate-use program in the United

States.  FF, supra ¶¶ 65, 66.  It is undisputed that Muller '434 met a long-felt need.

JTX-15 at ¶¶ 108-109, 15.0072-74; Tr. 792:11-17 (Guha).  The question is thus

whether a different long-felt and unmet need was met by the '589 Patent, and the

answer is no.

158.   UCB held blocking patents, including the Orange Book listed patents.  Tr. 668:4-

670:14 (Hakes); 809:14-810:17 (Hofmann).  It is reasonable to believe that, from

April 2005 to their imminent expiration this month, the Muller patents have served to

dissuade many competitors from investing in the development of therapeutically

effective rotigotine TTSs.  Tr. 802:11-803:8 (Hofmann); DDEM5-5.

159.   UCB acquired exclusive worldwide rights to rotigotine in 1998 for all therapeutic

indications.  Tr. 656:1-658:4, 679:23-680:10 (Hakes).

160.   Dr. Rahul Guha, expert for UCB, said that, had UCB previously tied the commercial

performance of the Neupro patches to the Muller '434 patent, then it is "possible that

---

identified [the patent application] and vetted it during fact and expert discovery long
ago," but "[t]hey did not identify it in any pleading, contention, [interrogatory] response
or expert report."  D.I. 179 at 1.  Nor did they introduce it at trial.  And, unsurprisingly,
Actavis asserts there are ways in which its expert could have disputed UCB's
interpretation of this reference, if there had been an opportunity.  *See* D.I. 179 at 2 ("WO
491 relates to 'co-precipitates' of rotigotine and PVP, a different technology to that of the
'589 Patent.").  I will therefore deny UCB's request.

there are multiple patents that are responsible for commercial success," but that was "not an analysis" he had done. Tr. 764:2-20, 794:1-795:6 (Guha); FF, supra ¶ 4.

161.    The factors driving sales of reformulated Neupro were the efficacy and safety of a rotigotine-containing TTS. Tr. 802:14-804:10 (Hofmann). The slight adjustment of the PVP content in Neupro patches is not what drives demand.

### M.    Written Description

162.    Actavis has failed to show, by clear and convincing evidence, that the disclosure of the '589 Patent fails to convey with reasonable clarity to a POSA that, as of the earliest filing date, the inventors were in possession of the subject matter claimed. Tr. 732:23-733:3 (Guy).

163.    The focus of the claimed invention described in the specification is the particular ratio of rotigotine free base to PVP, not the particular adhesive used. JTX-1 at 1.0001 (Abstract), 1:20-28, 3:28-46, 5:22-45, 6:12-19, 9:36–49; *see also* D.I. 80 at 9-10. Indeed, the '589 Patent's prosecution focused on the ratio of rotigotine to PVP. Tr. 497:20-498:5 (Myerson).

164.    A POSA would have understood that the dispersing agent's role is connected to the TTS structure. JTX-1 at 9:41-49. A POSA would have known that the purpose of the polymeric dispersing agent is to act as an adhesive and as a structural scaffold for the drug. *See, e.g.*, JTX-15 at ¶¶ 124, 138; *see also UCB I* (D.I. 211 (Actavis's Pretrial Order, Proposed Findings of Fact) at Ex. 3, ¶ 157 (adhesive "functions as an adhesive and a structural scaffold…")). This structure limits the polymers that can be the

dispersing agent, meaning the polymer must have the effect of making immiscible the reservoirs of rotigotine and PVP. JTX-1 at 6:8-11, 9:53-63.

165.   A POSA would understand from the '589 Patent's specification that the claimed invention relates to drug-in-adhesive transdermal patches and thus can very likely work in any of the pressure-sensitive adhesives, or mixtures thereof, commonly used for such patches. Tr. 724:10-733:3 (Guy); PTX-214; D.I. 80 at 9-10. The specification identifies as embodiments of dispersing agents non-aqueous polymer adhesive systems, including silicone-based polymers or copolymers or acrylates, or mixtures thereof. JTX-1 at 2:36-50, 4:12-15, 6:12-19, 7:57-67.

166.   The '589 Patent describes common properties of dispersing agents for use in the claimed invention. Tr. 724:10-733:3 (Guy); JTX-1 at 6:18-19 (PSAs), 3:52-65 & 6:20-64 (complex viscosity), 3:66-4:5 & 6:65-7:16 (peel adhesion), 4:6-11 & 7:17-38 (static shear adhesion), 7:39-42; 7:50-56 (lipophilic), 7:42-49; 8:35-40 (solubility for free base/impermeability for protonated form), 8:41-46 & 15:65-67 (Claim 3) (solubility levels for free base). Moreover, the '589 Patent provides examples for manufacturing patches using two types of silicone adhesives (Silicone BIO-PSA® Q7-4301 (high tack) and Q7-4201 (medium tack)), whose physical properties would be readily ascertainable by a POSA, as would be true of other adhesives with similar properties. JTX-1 at 7:61-67, 8:31-34, 12:40-14:33; Tr. 732:14-733:3 (Guy).

167.   A POSA would have understood, based on the adhesives and parameters described in the '589 Patent, and the claimed "solid dispersion," that: (1) a sufficient number of dispersing agents are identified by chemical name and physical properties to support

the full scope of the claims; and (2) structural features common to dispersing agents are described so that a POSA could recognize those that would be suitable.  FF, *supra* ¶¶ 164-68.

## III.    CONCLUSIONS OF LAW

### A.    POSA

1.  A patent and its prior art are viewed through the eyes of a POSA at the time of the invention.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed Cir. 2005) (defining "the time of the invention" as "the effective filing date of the patent application" (citations omitted)).  The POSA is a legal construct – "a hypothetical person who is presumed to know the relevant prior art."  *See In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).  "A person of ordinary skill is also a person of ordinary creativity, not an automaton."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

2.  "Factors that may be considered in determining the ordinary level of skill in the art include: 1) the types of problems encountered in the art; 2) the prior art solutions to those problems; 3) the rapidity with which innovations are made; 4) the sophistication of the technology; and 5) the educational level of active workers in the field."  *See Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666-67 (Fed. Cir. 2000).

### B.    Invalidity

3.  All issued patents are presumed valid.  "Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim."  35 U.S.C.

47

§ 282(a). A party challenging the validity of a patent claim must prove invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2240, 2242, 2245 (2011).

4. The claims are construed as set forth in the order of February 7, 2020. D.I. 80, 81.

### 1. Anticipation

5. "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). Anticipatory references should be considered for all that they teach. *Ultradent Prods., Inc. v. Life-Like Cosmetics, Inc.*, 127 F.3d 1065, 1068-69 (Fed. Cir. 1997); *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1324 n.6 (Fed. Cir. 2003).

6. Prior art printed publications are presumed enabling when asserted in support of anticipation. *See In re Antor Media Corp.*, 689 F.3d 1282, 1288 (Fed. Cir. 2012). U.S. patents are presumed enabling for their entire disclosure. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354-55 (Fed. Cir. 2003). "[P]roof of efficacy is not required" to enable anticipatory references. *Impax Labs., Inc. v. Aventis Pharm.*, 468 F.3d 1366, 1383 (Fed. Cir. 2006) (citations omitted).

7. "If a device was 'known or used by others' in this country before the date of invention . . . it qualifies as prior art." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1570 (Fed. Cir. 1997) (quoting 35 U.S.C. § 102(a) and (b) (pre-AIA)); *UCB, Inc. v. Watson Labs. Inc.*, 927 F.3d 1272, 1289-91 (Fed. Cir. 2019) (holding claim to be anticipated by a single use in the prior art).

8. "[A] reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a [POSA], reading the reference, would 'at once envisage' the claimed arrangement or combination." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (second alteration in original) (citation omitted); *see also Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012).

9. "[T]he relevant question is whether the reference is sufficiently clear in disclosing the *combinability* of . . . elements such that a [POSA] would 'at once envisage' the claimed combination." *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1350 (Fed. Cir. 2019) (emphasis added).

10. The Muller Patents, Braun, and Lauterbach '778 are prior art under § 102(b) as they were published more than one year before the effective filing date of the '589 Patent. FF, supra ¶¶ 73, 76, 93. original Neupro is prior art under § 102(b) as it was in public use and on sale in the U.S. more than one year before the effective filing date the '589 Patent. FF, supra ¶ 53. As discussed below, I need not reach the question of whether Lauterbach '778 or original Neupro anticipate the '589 Patent.

      i.    **The Muller Patents Anticipate the Asserted Claims of the '589 Patent**

11. A POSA reading Muller '747, and in particular claim 14, would readily envisage a TTS with 9% rotigotine and 4% or 5% PVP (i.e., a 9:4 or 9:5 TTS). FF, supra ¶¶ 78-83.

12. A POSA reading Muller '434, and in particular claim 15, would readily envisage the combination of a TTS with 9% rotigotine and 4% or 5% PVP (i.e., a 9:4 or 9:5 TTS). FF, supra ¶¶ 75, 79-83.

13. A POSA reading either of those Muller Patents' specifications, as a whole and in particular the 9:3 TTS taught by Example 2 and the 1.5% to 5% range of PVP claimed, would readily envisage a combination of a TTS with 9% rotigotine and 4% or 5% PVP (i.e., a 9:4 or 9:5 TTS). FF, supra ¶¶ 81, 85-90.

14. The Muller Patents teach a POSA to make and use 9:4 and 9:5 TTS embodiments without undue experimentation, and that was true before the emergence of Form II rotigotine crystals and remains true after. FF, supra ¶¶ 75, 78-79, 81, 85-86, 90; Tr. 173:25-175:18, 181:14-19 (Rogers).

15. The 9:4 and 9:5 TTSs taught and claimed by the Muller Patents meet every element of the Asserted Claims (Tr. 176:14-18, 183:17-184:15 (Rogers), 601:14-602:3 (Myerson); FF, supra, ¶¶ 75, 78, 84):

(a) solid dispersions comprising a dispersing agent and a dispersed phase comprising noncrystalline rotigotine free base and PVP in a R:PVP ratio of 9:4 to 9:6 (Claims 1, 2, and 11). FF, supra ¶¶ 79, 85, 90, 128-131; Tr. 173:2-21, 175:14-18, 176:5-177:4, 185:16-186:3, 312:22-314:4 (Rogers).

(b) "preparing" or "providing" a solid dispersion (Claims 1, 11). Tr. 185:6-15, 375:21-22 (Rogers).

(c) the same silicone "dispersing agent" as in the '589 Patent, with a solubility for rotigotine free base <1% (Claims 2, 3, and 11). Tr. 185:21-186:9, 375:23-25 (Rogers); FF, supra ¶¶ 88-90.

(d) "[TTSs]" and "pharmaceutical compositions" that are suitable for transdermal administration of a medicament (Claims 7, 10, 11). Tr. 184:20-25, 375:18-20 (Rogers); JTX-4 at 5:39-43; FF, supra ¶¶ 82-83.

(e) "solid dispersions" that are metastable because they contain amorphous rotigotine. Tr. 176:19-177:4, 185:16-20 (Rogers).

16. At trial, UCB's own expert, Dr. Myerson, acknowledged: "If somebody made a 9-to-4 or 9-to-5 [TTS in 2008] using the '747 patent, it would be of the same composition and be the same as the 9-to-4 and 9-to-5 made in the '589 patent. I don't disagree with that." Tr. at 601:14-23 (Myerson). And in answer to the question: "[D]o you agree that the patches that they, a [POSA] would have in 2008 would meet all the elements of the asserted claims of the '589 patent?" He answered, "Yes. They, they would, they would meet the claim. I don't disagree with that." Tr. 601:24-602:4 (Myerson)

17. Actavis has proven by clear and convincing evidence that the Asserted Claims are invalid as anticipated by Muller '747 and Muller '434 pursuant to 35 U.S.C. § 102.

**ii.      Braun Anticipates the Asserted Claims of the '589 Patent**

18. A POSA viewing the specification of Braun as a whole, and in particular the 9:2 TTS taught in Table 1 and the 1.5% to 5% range of PVP taught in the description, would

readily envisage a TTS with 9% rotigotine and 4% or 5% PVP (i.e., a 9:4 or 9:5 TTS). FF, supra ¶¶ 96-97; Tr. 181:20-183:23 (Rogers), 379:16-20 (Prausnitz).

19. Braun's specification teaches a POSA to make and use 9:4 and 9:5 TTS embodiments without undue experimentation, and, again, that holds true both before and after the emergence of Form II rotigotine crystals. Tr. 181:20-184:9 (Rogers); FF, supra ¶ 97.

20. The 9:4 and 9:5 TTSs taught by Braun meet every limitation of the Asserted Claims, including the limitations below (Tr. 184:10-15 (Rogers), 379:16-24 (Prausnitz)):

(a) solid dispersions comprising a dispersing agent and a dispersed phase comprising noncrystalline rotigotine free base and PVP in a ratio in a range from 9:4 to 9:6 (Claims 1, 2, and 11). Tr. 184:16-18, 185:16-20, 186:10-13; 186:18-187:2 (Rogers); FF, supra ¶¶ 95, 98.

(b) "prepare" and "provide" a solid dispersion (Claims 1 and 11). Tr. 185:6-15 (Rogers).

(c) the same "dispersing agent" as that disclosed and exemplified in the '589 Patent, which has a solubility for rotigotine free base below 1% (Claims 2, 3, and 11). Tr. 185:25-186:17 (Rogers); FF, supra ¶¶ 96-98.

(d) "[TTSs]" and "pharmaceutical compositions" that are suitable for transdermal administration of a medicament (Claims 7, 10, and 11). Tr. 185:1-5 (Rogers).

(e) "solid dispersion," as they are a metastable systems that contain amorphous, *i.e.* non crystalline, rotigotine (All Claims). Tr. 185:16-20 (Rogers).

21. Actavis has proven by clear and convincing evidence that the Asserted Claims are invalid as anticipated by Braun pursuant to 35 U.S.C. § 102.

### iii.    I Need Not Reach Whether Lauterbach '778 Anticipates the Asserted Claims of the '589 Patent

22. Lauterbach '778 teaches a POSA to make and use a 9:2 R:PVP patch that, due to the passage of rotigotine out of the patch and into the user, may be viewed as becoming equivalent to 9:4 and 9:5 R:PVP patches during a 24-hour course of therapy. FF, supra ¶¶ 101-108.

23. Based on that fact, Actavis contends that a TTS having a R:PVP ratio of 9:4 and 9:5 is taught and enabled by Lauterbach '778, and thus that Lauterbach '778 meets every limitation of the Asserted Claims.

24. But, because I have found that the '589 Patent is anticipated by the Muller Patents and Braun, I need not and do not reach whether Actavis has proven by clear and convincing evidence that the Asserted Claims are also invalid as anticipated by Lauterbach '778 pursuant to § 102.

### iv.    I Need Not Reach Whether Original Neupro Anticipates the Asserted Claims of the '589 Patent

25. Original Neupro constitutes a patch having a R:PVP ratio of 9:2, which arguably becomes equivalent to 9:4 and 9:5 patches in the course of a 24-hour therapy, due to the passage of rotigotine out of the patch and into the user. FF, supra ¶¶ 57-59. Actavis claims that, for this reason, original Neupro meets all elements of the Asserted Claims.

26. Again, however, because I have found that the '589 Patent is anticipated by the Muller Patents and Braun, I need not and do not reach whether Actavis has proven by

clear and convincing evidence that the Asserted Claims are also invalid as anticipated by the prior sale and public use of original Neupro in the U.S. pursuant to § 102.

### 2. Obviousness

27. A claim is obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a [POSA]." 35 U.S.C. § 103(a).

28. The ultimate determination of obviousness is a question of law based on underlying factual determinations, namely: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of nonobviousness. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406-07 (2007) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).

29. "If a device was in public use or on sale before the critical date, then that device becomes a reference under section 103 against the claimed invention." *TorPharm, Inc. v. Ranbaxy Pharm., Inc.*, 336 F.3d 1322, 1327 (Fed. Cir. 2003) (citation omitted).. "[T]he public use bar applies to obvious variants of the demonstrated public use." *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1326 (Fed. Cir. 2009) (citation omitted).

### i. The Asserted Claims Are Obvious as the Claimed TTSs Overlap with the R:PVP Ratio Range of TTSs Taught by the Muller Patents.

30. "Where a claimed range overlaps with a range disclosed in the prior art, there is a presumption of obviousness. The presumption can be rebutted if it can be shown that

the prior art teaches away from the claimed range, or the claimed range produces new and unexpected results." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) (citations omitted); *see also In re Huai-Hung Kao*, 639 F.3d 1057, 1067 (Fed. Cir. 2011) ("[W]here claimed range and prior art value are insubstantially different, prima facie obviousness rejection is proper." (citation omitted)); *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1380-81 (Fed. Cir. 2010) ("[A] prior art reference that discloses a range that encompasses or overlaps a claimed range generally is sufficient to establish a prima facie case of invalidity." (citations omitted)). The '589 Patent claims TTSs having R:PVP ratios of "about 9:4 to about 9:6" which significantly overlaps with the 9:1.5 to 9:5 range taught by the Muller Patents. Tr. 372:9-16, 385:2-385:10, 397:16-399:7 (Prausnitz); FF, supra ¶¶ 16-17, 21, 75, 78, 79. Actavis has thus set out a prima facie case, i.e., a rebuttable presumption, of obviousness.

31. UCB has not rebutted the "prima facie case" or "presumption" of obviousness established by this significant overlap. *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1006 (Fed. Cir. 2018); *see* CL, infra ¶¶ 44-54.[14]  In particular, UCB has not presented evidence indicating that the Asserted Claims produced "a new and unexpected result," the prior art taught away from the claimed range, the parameter was not known to be "result-effective," nor that the prior art range was "very broad." *Id.*; *id.* at 1008 (A patent challenger's "burden of persuasion is

---

[14] Citations to "CL" refers to paragraphs within the conclusions of law herein.

necessarily satisfied when there is no evidentiary reason to question the prior art's disclosure of a claimed range.").

32. Actavis has proven by clear and convincing evidence that the Asserted Claims are obvious over Muller '747.

**ii.    The Asserted Claims Are Obvious Over 9:2, 9:3 Prior Art TTS Examples in View of Muller's or Braun's Teachings of 1.5% to 5% PVP.**

33. Actavis has proven by clear and convincing evidence that the Asserted Claims are invalid as obvious over the Prior Art TTS Examples of 9:2 (Lauterbach '778, Schacht, Braun, original Neupro, and the Muller Patents) or 9:3 (the Muller Patents) TTSs in view of the Muller Patents' or Braun's teaching of 1.5% to 5% PVP.

34. The Prior Art TTS Examples are prior art under § 102(b).  FF, supra ¶ 125; CL, supra ¶ 10.

35. Actavis need not prove that all embodiments encompassed by the claimed range are obvious.  *See, e.g., In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1281 (Fed. Cir. 2015), *aff'd sub nom.*, 136 S. Ct. 2131 (2016).  Here, there is substantial overlap with the claimed range, which is sufficient to render it obvious. FF, supra ¶¶ 78-85, 95.

36. Actavis has established by clear and convincing evidence that a POSA would have ample motivation to modify the 9:2 or 9:3 Prior Art TTS Examples, to make a 9:4 or 9:5 TTS.  Tr. 394:14-21 (Prausnitz); FF, supra ¶¶ 125-137.

37. "[A] finding that the prior art as a whole suggests the desirability of a particular combination" does not require "that the prior art suggests that the combination claimed by the patent applicant is the preferred, or most desirable, combination." *In*

56

*re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004).  "The normal desire of scientists . . .
to improve upon what is already generally known provides the motivation to
determine where in a disclosed set of percentage ranges is the optimum combination
of percentages." *In re Peterson*, 315 F.3d 1325, 1330 (Fed. Cir. 2003) (citation
omitted).

38. "When there is a design need or market pressure to solve a problem and there are a
finite number of identified, predictable solutions, a [POSA] has good reason to pursue
the known options[.]" *KSR*, 550 U.S. at 421.

39. Actavis has established that a POSA would have "a reasonable expectation of success
of developing the claimed invention." *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286,
1292 (Fed. Cir. 2013); FF, supra ¶¶ 138-156.  Where, as is the case here, the prior art
provides the means of making the invention and predicts the results, and the results
are verifiable through "routine testing," the claims are obvious. *Pfizer, Inc. v. Apotex,
Inc.*, 480 F.3d 1348, 1367-68 (Fed. Cir. 2007) ("We find this case analogous to the
optimization of a range or other variable within the claims that flows from the 'normal
desire of scientists or artisans to improve upon what is already generally known.'"
(citation omitted)).  Tr. 391:5-21 (Prausnitz).  In other words, obviousness exists
when "a finite, and in the context of the art, small or easily traversed, number of
options . . . would convince an ordinarily skilled artisan of obviousness." *Ortho-
McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008)
(citing *KSR*, 550 U.S. at 421).

40. A POSA knew how to make patches with R:PVP ratios of 9:4 or 9:5, as disclosed in Muller or Braun, and doing so was routine. FF, supra ¶¶ 79-81, 86-90, 94-98. A POSA could conduct simple, routine experiments to confirm expected properties. FF, supra ¶¶ 130, 133, 146, 154-55; Tr. 367:17-370:18 (Prausnitz).

41. Actavis has proved by clear and convincing evidence that a POSA would have had a reasonable expectation of success in making and using a 9:4 or 9:5 TTS falling within the Asserted Claims.

### iii.      UCB Has Not Rebutted the Prima Facie Case of Obviousness and There Is No Meaningful Evidence of Secondary Considerations of Non-obviousness

42. As mentioned above, Actavis's prima facie case of obviousness, due to the substantial overlap in claimed ranges, may be rebutted "if it can be shown that the prior art teaches away from the claimed range, or the claimed range produces new and unexpected results[,]" or other pertinent evidence of non-obviousness. *Ormco Corp.*, 463 F.3d at 1311; *E.I. DuPont de Nemours & Co.*, 904 F.3d at 1006-07; CL, supra ¶ 38. The prior art does not, here, teach away from the claimed range, and the claimed range does not produce unexpected results. Moreover, there are no other secondary considerations to support a finding of non-obviousness. *See W. Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1373 (Fed. Cir. 2010); *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1245–46 (Fed. Cir. 2010).

43. The 9:4 and 9:5 patches did not exhibit unexpected results. The alleged unexpected results reported in the '589 Patent were inconsistent with UCB's internal reports, which confirmed that Sample No. 5 (9:4) shown in Figures 2 and 3 of the patent and

used in the dissolution experiment shown in Figure 1 all crystallized within a matter of weeks. FF, supra ¶ 30. Moreover, UCB attempted testing of small increases in PVP shortly after the discovery of Form II, which was consistent with scientific principles. UCB has not shown that a 9:4 to 9:6 range of ratios is an unexpectedly critical range, as opposed to an obvious adjustment after the appearance of Form II. FF, supra ¶¶ 29, 31.

44. Likewise, the Asserted Claims did not produce "new and unexpected result[s]" "different in kind and not merely in degree." *DuPont,* 904 F.3d at 1006. The 9:4 to 9:6 ratios produce results that are similar in kind to the Prior Art TTS Examples (i.e. 9:2 or 9:3), with similar levels of stability (i.e., lack of crystallization). Tr. 412:7-22 (Prausnitz).

45. UCB claims that it was unexpected that the claimed range demonstrated the *same* stability as the Prior Art TTS Examples. But that would not have been surprising to a POSA, nor does it appear to have surprised UCB, which tested a 9:4 patch within weeks of the appearance of Form II rotigotine crystals. FF, supra ¶¶ 68, 125-136.

46. There was a known and predictable effect from altering the PVP variable, "rendering [its] optimization within the grasp of one of ordinary skill in the art." *In re Applied Materials, Inc.,* 692 F.3d 1289, 1295 (Fed. Cir. 2012) (citation omitted). A POSA would know that increasing PVP would decrease the likelihood of crystallization. FF, supra ¶¶ 41-43, 129, 134. A POSA would also know that small increases would likely be sufficient, given the success of cold storage of original Neupro in Europe, the continued compassionate use of 9:2 patches in the U.S., and the known stabilizing

effect of small amounts of PVP. FF, supra ¶¶ 66-67, 126, 134. Thus, a POSA would

expect similar stability of the claimed range as compared to the Prior Art TTS

Examples.

47. The closest prior art, Muller '747, taught 9:4 and 9:5 TTSs. FF, supra ¶ 33.

48. The Muller Patents' and Braun's range of 9:1.5 to 9:5 would, in the eyes of a POSA,

represent a narrow range with a limited number of intervening ratios. FF, supra ¶¶ 81,

131. *See, e.g., Valeant Pharm. Int'l, Inc. v. Mylan Pharm. Inc.*, 955 F.3d 25, 34 (Fed.

Cir. 2020) (finding "bounded range of pH 3 to 4 presents a finite number of narrower

pH ranges for a skilled artisan to try").

49. There is no teaching away if a reference "merely expresses a general preference for an

alternative invention but does not 'criticize, discredit, or otherwise discourage'

investigation into the invention claimed." *DePuy Spine, Inc. v. Medtronic Sofamor

Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) (citation omitted). No prior art

taught away from the claimed range of 9:4 to 9:6.

50. Tang does not incorporate the context-specific clues for the proper stabilizing ratio for

rotigotine patches. FF, supra ¶¶ 118-19. At best, it leads a POSA to also consider the

possibility of increasing PVP beyond 9:4 to 9:6, after first trying those ratios.

However, a POSA would have first considered the claimed range. FF, supra, ¶¶ 131-

134.

51. UCB has not demonstrated a long-felt but unmet need. Here, the need for an effective

and stable rotigotine TTS was first met by the Muller Patents and original Neupro,

which UCB continued to sell from cold storage to patients in Europe, and distribute to

patients in the U.S. for compassionate use even following the appearance of Form II

rotigotine crystals. FF, supra ¶ 157; *AstraZeneca LP v. Breath Ltd.*, 88 F. Supp. 3d

326, 387-88 (D.N.J. 2015) (long-felt need met by drug approved in Europe)

(explaining no long-felt need where prior art products were effective), *aff'd*, 603 F.

App'x 999 (Fed. Cir. 2015); *Novartis AG v. Torrent Pharm. Ltd.*, 853 F.3d 1316,

1330-31 (Fed. Cir. 2017) (being "first to receive FDA approval" not probative).

52. To the extent a new need developed following the appearance of Form II rotigotine

crystals and the recall of original Neupro, the solution to that need was quickly

realized and a patent application filed, leading to the eventual FDA approval of

reformulated Neupro four years later, in April 2012. PTX-482; Tr. 639:11-15,

652:19-653:22 (Hakes), 428:9-429:4 (Prausnitz), 596:18-598:6 (Myerson), 759:17-

762:1 (Guy); PTX-396.

53. UCB must establish a nexus between the '589 Patent and any alleged secondary

considerations, and no presumption of nexus applies because UCB alleges numerous

patents cover the currently-marketed Neupro. SUF ¶ 10. *Fox Factory, Inc. v. SRAM,

LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019). Indeed, until this month, March 2021,

when the '434 Patent expires, Actavis is enjoined from marketing a generic version of

reformulated Neupro by *UCB, Inc. v. Watson Labs., Inc.*, No. 14-cv-1083-SLR-SRF

(D. Del. Nov. 14, 2017), ECF No. 270 based on the '434 Patent.

54. Where "market entry by others was precluded [due to blocking patents], the inference

of non-obviousness . . . from evidence of commercial success, is weak." *Galderma

Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740–41 (Fed. Cir. 2013) (first alteration in

original) (citation omitted).  In this case, the Muller Patents have operated as blocking patents, dissuading competitors from developing a rotigotine TTS, at least until the expiration of the '434 Patent.  FF, supra ¶¶ 158-161.

### 3. The Asserted Claims Are Invalid for Obviousness-Type Double Patenting Over the Muller Patents.

55. Obviousness-type double patenting ("ODP") "prohibit[s]…obtaining an extension of the right to exclude through claims in a later patent that are not patentably distinct from claims in a commonly owned earlier patent." *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 518 F.3d 1353, 1363 (Fed. Cir. 2008) (first alteration in original) (citation omitted).

56. UCB's Muller Patents expire prior to the '589 Patent's expiration. FF, supra ¶¶ 12, 73, 76.

57. Claim 14 of Muller '747 is limited to a TTS having 9% rotigotine and 1.5 to 5% PVP. FF, supra ¶ 78.  Claim 15 of Muller '434 is limited to a TTS having an effective amount of rotigotine to treat Parkinson's Disease, which a POSA would understand as 9%, and 1.5 to 5% PVP.  FF, supra ¶ 75.

58. A POSA would readily envisage 9:4 and 9:5 TTSs within those claims and would have a reasonable expectation of success in making and using them.  Tr. 173:2-21 (Rogers), 599:4-601:23 (Myerson); FF, supra, ¶¶ 79, 138, 150.

59. Thus, and as discussed above, the R:PVP ratio provides no patentable distinction between the '589 Patent and the Muller Patents, and UCB's expert discussed no other ODP limitations. Tr. 525:16-527:15 (Myerson); FF, supra ¶ 80.

60. Asserted Claims 1 and 11 recite a method of "preparing" or "providing" and are not patentable over earlier Muller claims to the same composition, as those '589 claims do not describe anything inventive. Tr. 411:2-412:6 (Prausnitz). *Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381, 1387 (Fed. Cir. 2010) ("claim to a method of using a composition is not patentably distinct from an earlier claim to the identical composition in a patent disclosing the identical use" (citation omitted)).

61. Asserted Claims 3, 7, and 10 also provide no patentable distinction. Tr. 399:10-21 (Prausnitz). With respect to Asserted Claim 3, the solubility of rotigotine in the silicone dispersing agent is an inherent property, and the same silicone adhesives are used and disclosed in the prior art. Tr. 342:10-343:6, 398:19-399:21 (Prausnitz). Asserted Claims 7 and 10 recite a "TTS" and "pharmaceutical composition," respectively, which are characteristics of the TTSs claimed in the Muller Patents. FF, supra ¶ 85.

62. Actavis has proven by clear and convincing evidence that the Asserted Claims are invalid for ODP in view of claim 14 of Muller '747 and claim 15 of Muller '434.

### 4.    Written Description

63. Under 35 U.S.C. § 112(a), the specification of a patent "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the

same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention."

64. "[T]he test for sufficiency [of a written description] is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (citations omitted).

65. "[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a [POSA]." *Id.* at 1351.

66. The factors to consider "for evaluating the adequacy of the" written description include "the existing knowledge in the particular field, the extent and content of the prior art, the maturity of the science or technology, [and] the predictability of the aspect at issue." *Id.* (alteration in original) (quoting *Capon v. Eshhar*, 418 F.3d 1349, 1359 (Fed. Cir. 2005)).

67. A POSA "is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

68. Actavis has not shown by clear and convincing evidence that the disclosure of the '589 Patent fails to convey with reasonable clarity to a POSA that, as of the earliest filing date, the inventors were in possession of the subject matter claimed. FF, *supra* ¶¶ 162-167.

## IV.    SUMMARY OF CONCLUSIONS

For the reasons set forth herein, the '589 Patent is invalid as both obvious and anticipated over the prior art.  Accordingly, judgment will be entered in favor of Actavis and against UCB.

Kent A. Jordan, Circuit Judge
Sitting by designation

March 26, 2021
Wilmington, Delaware